**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Holding a Criminal Term**
**Grand Jury Sworn in on May 7, 2012**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** |
| | : | |
| **v.** | : | **VIOLATIONS:** |
| | : | |
| **JAE SHIK KIM,** | : | **18 U.S.C. § 371** |
| **DEFENDANT KARHAM ENG. CORP.,** | : | **(Conspiracy)** |
| | : | |
| **Defendants.** | : | **22 U.S.C. § 2778** |
| | : | **(Arms Export Control Act)** |
| | : | |
| | : | **22 C.F.R. Parts 120 – 130** |
| | : | **(International Traffic in Arms Regulations)** |
| | : | |
| | : | **50 U.S.C. § 1705** |
| | : | **(International Emergency Economic** |
| | : | **Powers Act)** |
| | : | |
| | : | **31 C.F.R. Part 560** |
| | : | **(Iranian Transactions Regulations)** |
| | : | |
| | : | **18 U.S.C. § 1001** |
| | : | **(False Statements)** |
| | : | |
| | : | **18 U.S.C. § 2** |
| | : | **(Aiding and Abetting and** |
| | : | **Causing an Act to Be Done)** |
| | : | |
| | : | **18 U.S.C. § 981(a)(1)(c)** |
| | : | **28 U.S.C. § 2461(c)** |
| | : | **(Criminal Forfeiture)** |

## <u>I N D I C T M E N T</u>

The Grand Jury charges that:

## <u>COUNT ONE</u>
**(Conspiracy to Unlawfully Export U.S.-Origin Goods and "Defense Articles"**

**and to Defraud the United States**)

At all times material to this Indictment:

## Introduction

## The Defendants

1.      Defendant JAE SHIK KIM ("DEFENDANT KIM") was a citizen of South Korea.   Defendant KARHAM ENG. CORP. ("DEFENDANT KARHAM") was a company located in Seoul, South Korea.  DEFENDANT KIM was the President and CEO of DEFENDANT KARHAM. Beginning on or about December 20, 2007, and continuing through in or around March 2010, DEFENDANT KIM and DEFENDANT KARHAM conspired with individuals located in China and Iran to procure and attempt to procure U.S.-origin aircraft parts that were used in the navigation systems of aircraft and missiles and to export those parts from the United States to Iran.

The International Emergency Economic Powers Act and

TThe Arms Export Control Act and
the International Traffic in Arms Regulations

2.      The Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, authorized the President of the United States, among other things, to control the export of "defense articles."   22 U.S.C. § 2778(a)(1).   AECA also gave the President the authority to designate items as "defense articles."   Id.  As a practical matter, that task was performed by the Department of State ("DOS"), with the concurrence of the Department of Defense ("DOD"), through regulations that were promulgated by the DOS's Directorate of Defense Trade Controls

("DDTC"), which was located in the District of Columbia.   22 C.F.R. Parts 120.1(a) and 120.2.   The regulations promulgated by the DDTC were known as the International Traffic in Arms Regulations ("ITAR"), and specify which items are designated as defense articles.   22 C.F.R. Parts 120 - 130.   All defense articles were identified by category in a portion of the ITAR that is known as the "United States Munitions List."

3.   Category XII of the United States Munitions List includes fire control, range finder, optical and guidance and control equipment.   This category includes inertial platforms and sensors for weapons systems to include astrocompasses, star trackers, and military accelerometers.   The Q-Flex Accelerometer, Model QA-2000-20, is manufactured by Honeywell Aerospace and is used in aircraft and missile navigation systems.   The QA-2000-20 accelerometer is a defense article under Category XII of the United States Munitions List.

4.   All defenses article exporters were also required to obtain an export license ("export license") from the DDTC for any defense article—regardless of its value—before the article was exported to another country.   22 U.S.C. § 2778(b)(2) and 22 C.F.R. Part 123(a).   In practice, several defense articles were often identified on a single "export license."

5.   It was a crime for anyone to willfully violate any provision of 22 U.S.C. § 2778 or any rule or regulation issued under that section.   22 U.S.C. § 2778(c).   Specifically, it was a crime for any defense article exporter to willfully

fail to obtain an export license before exporting a defense article to another country.  22 U.S.C. § 2778(c) and 22 C.F.R. Part 127.1(a) (1).  Pursuant to the ITAR, it was a violation for a person to conspire to export or to cause to be exported any defense article without having obtained an export license to do so beforehand.  22 C.F.R. Part 127.1.  It was also unlawful for any person to "knowingly or willfully cause, or aid, abet, counsel, demand, induce, procure, or permit the commission of any act prohibited by 22 U.S.C. § 2778," or any regulation issued there under.  22 C.F.R. Part 127.1(d).

<u>The International Emergency Economic Powers Act and<br>the Iranian Transactions Regulations</u>

6.      The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C §§ 1701-1706, authorized the President of the United States ("the President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy or economy of the United States when the President declares a national emergency with respect to that threat.  Pursuant to the authority under the IEEPA, the President and the executive branch have issued orders and regulations governing and prohibiting certain transactions with Iran by U.S. persons or involving U.S.-origin goods.

7.      On May 6, 1995, the President issued Executive Order No. 12959, prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person.  Pursuant to Executive Order 12959

and subsequent Executive Orders, the President authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders.  Pursuant to this authority, the Secretary of the Treasury promulgated the ITR, implementing the sanctions imposed by the Executive Orders.

8.      The Iranian Transactions Regulations ("ITR"), 31 C.F.R. Part 560, generally prohibited any person from exporting or causing to be exported from the United States any goods, technology, or services without having first obtained an export license from the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"), which was located in the District of Columbia. The ITR imposed, among others, the following prohibitions:

Section 560.203 - Prohibition of any Transaction to Evade or Avoid the Embargo and any Attempt to Violate the Embargo:

Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited.

Section 560.204 - Prohibition of any Sale or Supply of any Goods, Technology, Services to Iran or the Iranian Government:

Except as otherwise authorized [by a license issued by OFAC], the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

(a)  Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran . . .

Export and Shipping Records

5

9.      Pursuant to United States law and regulation, exporters and shippers or freight forwarders were required to file certain forms and declarations concerning exports of goods and technology from the United States. Typically, those filings were filed electronically through the Automated Export System ("AES") administered by the Department of Homeland Security ("DHS"), Bureau of Customs and Border Protection, which was headquartered in the District of Columbia. A Shipper's Export Declaration ("SED") was an official document submitted to DHS in connection with export shipments from the United States.

10.     An essential and material part of the SED and AES, as well as other export filings, was information concerning the end-user or ultimate destination of the export. The identity of the end-user may determine whether the goods may be exported: (a) without any specific authorization from the United States government; (b) with the specific authorization or license from the United States Department of Commerce, the United States Department of State, or the United States Department of the Treasury; or (c) whether the goods may not be exported from the United States.

11.     The SED or AES was a statement to the United States government that the transaction occurred as described. The SED or AES was used by the United States Bureau of Census to collect trade statistics and by the Bureau of Industry and Security, Department of Commerce, which was located in the District of Columbia, for export control purposes. Other United States government agencies located in the District of Columbia also relied upon the

6

information provided by SED and AES records.

## A. **THE CONSPIRACY**

12.     Beginning on or about December 20, 2007, and continuing through in or around March 2010, DEFENDANT KIM and DEFENDANT KARHAM did willfully combine, conspire, and agree with others known and unknown to the Grand Jury, to:  (a) commit offenses against the United States, that is, to export and cause the exportation of goods and "defense articles" from the United States to Iran in violation of the prohibitions imposed upon that country by the United States Government, without having first obtained the required licenses from DDTC and OFAC, located in the District of Columbia, in violation of Title 50, United States Code, Section 1705 (IEEPA), Title 31, Code of Federal Regulations, Parts 560.203 and 560.204 (ITR), Title 22, United States Code, Section 2778 (AECA), and Title 22, Code of Federal Regulations, Parts 120 – 130 (ITAR); and (b) defraud the United States Government by interfering with and obstructing a lawful government function, that is, the enforcement of laws and regulations prohibiting the export or supply of goods and "defense articles" from the United States to Iran and other countries without having first obtained the required licenses from OFAC and DDTC, by deceit, craft, trickery, and dishonest means, in violation of Title 18, United States Code, Section 371.

13.     Other known members of the conspiracy included the following companies and individuals:

(1).         A Chinese national and co-conspirator who wanted

to supply his Iranian customers with the goods and "defense articles" (hereinafter, "Co-conspirator BY");

(2).      An Iranian national and the customer of Co-conspirator BY who wanted to purchase the goods and "defense articles" (hereinafter, "Co-conspirator PH");

(3).      Company ACC was an entity in Stevenson Ranch, California, apparently controlled and utilized by DEFENDANT KIM and DEFENDANT KARHAM to submit the purchase order(s) for the goods and "defense articles" that were going to be sold to Co-conspirator PH.

14.    During the period of the conspiracy, DEFENDANT KIM and Co-conspirator BY sometimes communicated by email with a South Korean national and employee of DEFENDANT KARHAM, who assisted DEFENDANT KIM in acquiring the goods and "defense articles" (hereinafter, "Individual MJ").

15.    The conduct alleged in this Indictment occurred within the District of Columbia and elsewhere, and therefore within the venue of the United States District Court for the District of Columbia pursuant to Title 18, United States Code, Section 3237(a). Additionally, the conduct alleged in this Indictment began outside the jurisdiction of any particular state or district of the United States, but within the jurisdiction of the United States and therefore, pursuant to Title 18, United States Code, Section 3238, within the venue of the United States District Court for the District of Columbia.

**B.  <u>OBJECTS OF THE CONSPIRACY</u>**

8

16.     The objects of the conspiracy were:

(1).          to acquire U.S.-origin goods and "defense articles" from the United States,   that is, aircraft parts known as accelerometers (officially known as the Q-Flex Accelerometer, Models QA-2000-10, QA-2000-20 or QA-3000) manufactured by a company in Redmond, Washington ("Honeywell"), to supply to Co-conspirator PH for use in Iran;

(2).          to conceal from United States companies and the United States Government that the U.S.-origin goods and "defense articles" were intended for export and were destined for Iran;

(3).          to make a financial profit for DEFENDANT KIM and DEFENDANT KARHAM and other conspirators;

(4).          to conceal and redistribute financial profits arising from this unlawful business for the benefit of DEFENDANT KIM and DEFENDANT KARHAM and other conspirators; and

(5).          to evade the regulations, prohibitions, and licensing requirements of the AECA, ITAR, IEEPA, and ITR.

C. **MANNER AND MEANS OF THE CONSPIRACY**

17.     The manner and means by which DEFENDANT KIM and DEFENDANT KARHAM and other conspirators sought to accomplish the objects of the conspiracy included, among others, the following:

(1).          DEFENDANT KIM and DEFENDANT KARHAM and other conspirators planned and acted inside and outside of the United

States to acquire U.S.-origin goods and "defense articles";

(2).   DEFENDANT KIM and DEFENDANT KARHAM and other conspirators used electronic communications (e.g., electronic mail ("email")) and other forms of communication to communicate with one another and with other individuals, including Co-conspirator BY, Individual MJ, and Company ACC, located in China, the United States, and elsewhere;

(3).   DEFENDANT KIM and DEFENDANT KARHAM and other conspirators negotiated the price for which Honeywell would manufacture and sell six accelerometers for the purpose of purchasing those U.S.-origin goods and "defense articles" for the purchase and shipment of said goods and "defense articles" to Iran, through the intermediary countries of South Korea and China;

(4).   DEFENDANT KIM and DEFENDANT KARHAM caused Co-conspirator BY to wire money from accounts outside the United States to accounts outside the United States belonging to DEFENDANT KARHAM as payment for the purchase of U.S.-origin goods and "defense articles" from Honeywell;

(5).   DEFENDANT KIM and DEFENDANT KARHAM and other conspirators intentionally concealed from Honeywell, shippers, and freight forwarders located in the United States and elsewhere the true identity of the ultimate end-use and end-users of the U.S.-origin goods and "defense articles";

(6). DEFENDANT KIM and DEFENDANT KARHAM and other conspirators intentionally caused to be submitted false information on SEDs to the United States Government, concealing from the United States Government the true identity of the ultimate end-use and end-users of the U.S.-origin goods; and

(7). DEFENDANT KIM and DEFENDANT KARHAM and other conspirators caused or attempted to cause the U.S.-origin goods and "defense articles" to be exported from the United States to South Korea and China for transfer to Iran without first obtaining a license from DDTC and OFAC, located in the District of Columbia.

## D. **OVERT ACTS**

**The completed transaction to purchase accelerometers.**

18. In furtherance of the above-described conspiracy, and in order to carry out the objects thereof, DEFENDANT KIM and DEFENDANT KARHAM and others known and unknown to the Grand Jury committed or caused to be committed, in the District of Columbia and elsewhere, at least one of the following overt acts, among others:

(1).On or about December 20, 2007, Co-conspirator BY sent an email to DEFENDANT KIM asking DEFENDANT KIM for help in acquiring 30 "QA 2000 accelerometer[s]" for "[o]ne Iran friend" because "American is making troubles to them [sic], they can't get it directly." The "Iran friend" was Co-conspirator PH. Co-conspirator BY also asked DEFENDANT KIM to obtain

information about the cost and delivery time for 30 accelerometers.

(2).On or about December 20, 2007, DEFENDANT KIM emailed Co-conspirator BY and told him to "ask your friend to make sure the exact[ ]" product number because there are different models of the QA 2000.

(3).On or about December 21, 2007, Co-conspirator BY emailed DEFENDANT KIM and said: "He wants the model: QA 2000-10 AND QA 2000-20."

(4).On or about January 2, 2008, Co-conspirator BY emailed DEFENDANT KIM to provide DEFENDANT KIM with false information about the actual purchaser and end use for the accelerometers. Co-conspirator BY claimed the accelerometers were being purchased by China Southern Airlines Corp. for use in the inertial navigation systems of Boeing airplanes. Both DEFENDANT KIM and Co-conspirator BY knew this information was false, and was being supplied as a cover to DEFENDANT KIM to justify the purchase of the accelerometers. DEFENDANT KIM already knew the accelerometers were being purchased by an "Iran friend."

(5).On or about January 4, 2008, DEFENDANT KIM sent an email to Co-conspirator BY providing information about the price from the "USA office" for the custom order manufacture of 30 QA-2000-10 and 30 QA-2000-20 accelerometers, with a delivery time of 12-14 weeks.

(6).On or about January 10, 2008, Co-conspirator BY emailed DEFENDANT KIM, explaining that the "customer," that is, Co-conspirator PH,

12

wanted to place a trial order of 6 QA-2000-20 accelerometers.  Co-conspirator BY also provided certain price and delivery terms and asked DEFENDANT KIM to determine if the "USA office" would confirm this order.

(7).On or about January 10, 2008, DEFENDANT KIM emailed Co-conspirator BY and said he would ask the "USA office" whether they would accept the terms and he would get back to Co-conspirator BY soon.

(8).On or about January 10, 2008, DEFENDANT KIM sent an email to Individual MJ, stating that the "Factory didn't accept the same price for 6" accelerometers.  DEFENDANT KIM explained the price and delivery terms of the order to Individual MJ.

(9).On or about January 22, 2008, Individual MJ sent an email to Co-conspirator BY with the terms DEFENDANT KIM had provided for the manufacture and delivery of 6 accelerometers.  Individual MJ's email stated: "QA 2000-20 6 pcs USD4,680.-Del: 6~8 weeks (Deposit 30%, NCNR)."  In other words, DEFENDANT KIM would provide Co-conspirator BY with 6 accelerometers for $4,680 per unit, with a 30% deposit, no credit, no return, and a delivery time of 6 to 8 weeks.  Under these terms, Co-conspirator BY would pay DEFENDANT KIM and DEFENDANT KARHAM a total price of $28,080 for 6 QA-2000-20 accelerometers.

(10).On or about January 22, 2008, Co-conspirator BY emailed Individual MJ, with DEFENDANT KIM carbon copied, accepting the order, stating:  "Everything is good, except the delivery time, if they could arrange a

13

shorter delivery time, that would be perfect."

(11).On or about February 4, 2008, Co-conspirator BY emailed Individual MJ, with DEFENDANT KIM carbon copied, informing DEFENDANT KIM and Individual MJ that a prepayment, or deposit for the accelerometers, had been sent to DEFENDANT KARHAM's bank account. The email included an attachment of the wire transfer form showing the payment from the Bank of China to DEFENDANT KARHAM's bank account in South Korea.

(12).On or about February 12, 2008, DEFENDANT KIM and DEFENDANT KARHAM caused Company ACC to fax a purchase order to Honeywell for the purchase of 6 QA-2000-20 accelerometers for the unit price of $4,180 and a total price of $25,080. The purchase order included instructions that when the accelerometers were ready, they should be shipped to a freight forwarder in Carson, California.

(13).On or about March 26, 2008, DEFENDANT KIM sent an email to Co-conspirator BY, with Individual MJ carbon copied, discussing whether the accelerometers would be delivered by the American manufacturer to a freight forwarder in the United States, and then on to either South Korea or China. DEFENDANT KIM noted that if the accelerometers were delivered to South Korea, he could forward the package to China with a shipping invoice that indicated the contents had no commercial value because they were samples, but the "USA required everything formal."

(14).On or about April 1, 2008, Co-conspirator BY sent an email to

DEFENDANT KIM inquiring whether the American manufacturer had shipped the accelerometers to South Korea.  Co-conspirator BY said, "I am collecting the money, and in 2-3 days it will [be] ok, and then I could arrange the payment to you.  Now as the customer's [that is, Co-conspirator PH's] visiting schedule [to China to purchase the accelerometers] is coming soon, would you please update me [about] the shipping schedule, so I could have an idea about the time."

(15).On or about April 1, 2008, DEFENDANT KIM responded to Co-conspirator BY's email, stating:  "I heard the goods came out [from the] Factory and carrying inland in USA [sic].  They will ship us Tomorrow or The day next of Tomorrow at least."

(16).On or about April 4, 2008, DEFENDANT KIM and DEFENDANT KARHAM caused the freight forwarder in Carson, California, to create a false Shipper's Export Declaration ("SED") regarding the exportation of the Honeywell accelerometers, in that the SED falsely stated that the "ultimate consignee," or final destination, for the accelerometers was "Karham Eng Corp" in Seoul, KR, that is, DEFENDANT KARHAM, and that no license was required for exportation of the accelerometers.

(17).On or about April 4, 2008, DEFENDANT KIM and DEFENDANT KARHAM caused the 6 Honeywell accelerometers to be exported from the United States on Asiana Airlines Flight 283, a cargo flight originating from the Los Angeles (CA) International Airport, with one stop at San Francisco (CA) International Airport, and continuing to Incheon International Airport in

15

Seoul, South Korea.

(18).On or about April 4, 2008, DEFENDANT KIM sent an email to Co-conspirator BY, with Individual MJ carbon copied, that included two attachments. One attachment was an invoice on DEFENDANT KARHAM letterhead, which falsely stated that the accelerometers in the package were "Samples sent free of [charge] for customer's testing – No commercial Value –". Once the accelerometers were delivered from the United States to DEFENDANT KIM in South Korea, DEFENDANT KIM planned to send that false invoice with the package that would be delivered to Co-conspirator BY in China, so that Co-conspirator BY could use that false invoice to clear the accelerometers through customs in China. The second attachment was an invoice on DEFENDANT KARHAM letterhead that contained the true pricing information, that is, 6 QA-2000-20 sensors were being sold to Co-conspirator BY for $4,450 per unit, for a total of $26,700. DEFENDANT KIM asked Co-conspirator BY to sign and return the second invoice so that it could become a contract between them. The contract price of $4,450 per unit was lower than the original price of $4,680 per unit.

(19).On or about April 7, 2008, Co-conspirator BY sent an email to DEFENDANT KIM, with Individual MJ carbon copied, stating that Co-conspirator BY had sent a payment of approximately $17,000 to DEFENDANT KARHAM's bank account and that Co-conspirator BY still owed another $2,656 for the accelerometers. Co-conspirator BY stated that the "customer," that is, Co-conspirator PH, would arrive in Shanghai, China to pick up the accelerometers on

16

April 11, 2008.

(20). On or about April 10, 2008, DEFENDANT KIM emailed Co-conspirator BY to inform him that the accelerometers should be arriving soon at the airport in Shanghai, China.

(21). On or about April 13, 2008, Co-conspirator BY sent an email to DEFENDANT KIM, with Individual MJ carbon copied, which said, "Firstly, I would like to thank you for all your kindly supports for this order." Co-conspirator BY explained that he planned to pick up the accelerometers the next day, on Monday, April 14, 2008, and once he obtained them "it will be a good end for the customer and also a good start for the 2nd order with them."

(22). On or about April 24, 2008, Co-conspirator BY sent an email to DEFENDANT KIM, with Individual MJ carbon copied, which said the customer, that is, Co-conspirator PH, had received the accelerometers and Co-conspirator BY was ready to pay the balance of $2,656.

(23). On or about April 25, 2008, DEFENDANT KIM sent an email to Co-conspirator BY, with Individual MJ carbon copied, requesting that Co-conspirator BY pay the remaining $2,656 to the same account, that is, DEFENDANT KARHAM's bank account, and not DEFENDANT KIM's personal account to avoid high handling charges.

**The attempted transaction to purchase accelerometers.**

(24). On or about October 11, 2009, Co-conspirator BY initiated the second attempt to purchase Honeywell accelerometers for Co-conspirator PH by

17

sending the following email to DEFENDANT KIM: "Hi.  The new purchase to [sic] QA2000/010 is restarting by the client.  Would you please kindly have a check to the recent price & delivery time. They may need about 10-20 pcs and they hope they can have a good discount."

(25).On or about October 13, 2009, DEFENDANT KIM emailed Co-conspirator BY, saying that he sent "this inquiry to our USA office and waiting their reply."

(26).On or about October 13, 2009, Co-conspirator BY sent an email to DEFENDANT KIM explaining that the client, that is, Co-conspirator PH, wanted to purchase 3 QA-3000 accelerometers and 10 to 20 QA-2000-10 accelerometers, but the purchase of the QA-2000-10 accelerometers would depend on the new price and delivery time.

(27).On or about October 22, 2009, DEFENDANT KIM sent Co-conspirator BY an email explaining that his USA office and partners were not responding because of the difficulty in obtaining an export license for military products destined for Iran and North Korea.  DEFENDANT KIM's complete email, largely as written, states:

Unfortunately, We couldn't receive[ ] any reply from USA office and partners. We had been heard about their hard situation to do suplying these parts and taking the Export License belong to National Export Association.  The[y] needed details information about end users and Application.  Specially, They required the end user's License with Certification.  Can you please get them?  As you understand, America is very strict about military products to go [to] Iran and North Korea [sic].

(28).On or about March 2, 2010, Co-conspirator BY sent an email to a

18

DEFENDANT KARHAM employee, with DEFENDANT KIM carbon copied, renewing the inquiry about purchasing QA-3000 and QA-2000 accelerometers.

(29).On or about March 2, 2010, DEFENDANT KIM responded by email to Co-conspirator BY, saying (as written): "Unfortunately, I've received a letter what they wanted gave up these part. As you understand, Not only our USA office but also other partners in USA are not easy to handle this parts without a special EL(Export License) of USA gorverment and full data of User. Regardless of End user information, They don't want to handle this kind of sensitivity parts." [Sic.]

(30).On or about March 3, 2010, Co-conspirator BY sent the final email to DEFENDANT KIM on this subject, acknowledging that it was not easy to get the QA-3000 model because it was a new and advanced accelerometer made in the United States, but hoping that it would be easier to acquire the QA-2000 model because it was older. Co-conspirator BY mentioned that "The clients for QA2000, they are distributor and some end users, one is we had sold some pcs in 2008. . . .We understand the operation, and please don't worry, when we can confirm their real purchase ability and we will talk to them about the end user information." [Sic.]

## Failure to Obtain a License

DEFENDANT KIM and DEFENDANT KARHAM and other conspirators failed to apply for, receive, and possess, and caused others to fail to apply for, receive, and possess a license

from OFAC and DDTC, located in the District of Columbia, to export any of the U.S.-origin

goods and ITAR-controlled accelerometers set forth above from the United States to Iran.

(**Conspiracy to Unlawfully Export U.S. Goods and "Defense Articles" to Iran and to Defraud the United States**, in violation of Title 18, United States Code, Section 371; Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Part 560; Title 22, United States Code, Section 2778; and Title 22, Code of Federal Regulations, Parts 120 – 130)

## COUNT TWO
### (Unlawful Export or Attempted Export of Defense Articles to Iran)

19.     The allegations in Paragraphs 1 through 15, and 18 of this

Indictment are incorporated and re-alleged by reference herein.

20.     On or about April 4, 2008 through at least on or about April 14,

2008, in the District of Columbia and elsewhere, DEFENDANT JAE SHIK KIM

and DEFENDANT KARHAM ENG. CORP., and other conspirators, did willfully

export and cause to be exported U.S.-origin ITAR-controlled goods, that is,

Honeywell Aerospace QA-2000-20 accelerometers with an approximate value of

$28,080, from the United States to Iran, without having first obtained the required

license from the United States Department of State's Directorate of Defense

Trade Controls, located in the District of Columbia.

(**Unlawful Export or Attempted Export of Defense Articles to Iran**, in violation of Title 22, United States Code, Section 2778 and Title 22, Code of Federal Regulations, Parts 120 – 130; **Aiding and Abetting and Causing an Act to be Done**, in violation of Title 18, United States Code, Section 2.)

## COUNT THREE
### (Unlawful Export of U.S.-Origin Accelerometers to Iran)

21.     The allegations in Paragraphs 1 through 15, and 18 of this

Indictment are incorporated and re-alleged by reference herein.

20

22.     On or about April 4, 2008, in the District of Columbia and elsewhere, DEFENDANT JAE SHIK KIM and DEFENDANT KARHAM ENG. CORP., and other conspirators, did willfully export and reexport, attempt to export and reexport, and cause to be exported and reexported U.S.-origin goods, that is, six QA-2000-20 accelerometers with an approximate value of $28,080, from the United States to Iran, through South Korea and China, without having first obtained the required license from the United States Department of the Treasury, Office of Foreign Assets Control, located in the District of Columbia.

(**Unlawful Export or Attempted Export of U.S.-Origin Accelerometers to Iran**, in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Part 560; **Aiding and Abetting and Causing an Act to be Done**, in violation of Title 18, United States Code, Section 2.)

<u>COUNT FOUR</u>
(**Material False Statements**)

23.     The allegations in Paragraphs 1 through 15, and 18 of this Indictment are incorporated and re-alleged by reference herein.

24.     April 4, 2008, within the District of  Columbia and elsewhere, DEFENDANT JAE SHIK KIM and DEFENDANT KARHAM ENG. CORP., and other conspirators, in a matter within the jurisdiction of the United States Department of Homeland Security, Customs and Border Protection, and the United States Department of Commerce, Bureau of Industry and Security, both of which are located in the District of Columbia, did knowingly and willfully falsify, conceal, and cover up and cause to be falsified, concealed, and covered up, by a trick, scheme, and device, material facts and made and caused to be made false,

21

fictitious and fraudulent statements and representations as to a material fact, and made and used and caused to be made or used a false writing and document knowing the same to contain a false, fictitious and fraudulent entry, by creating false and fictitious shipping documents, including a Shipper's Export Declaration, which stated that the ultimate consignee of shipments of U.S.-origin Honeywell Aerospace accelerometers was a company in South Korea, and the ultimate destination of the shipments of U.S.-origin aircraft parts was South Korea, and that no license was required, when DEFENDANT JAE SHIK KIM and DEFENDANT KARHAM ENG. CORP., and other conspirators there and then knew well that these statements were false.

(**Material False Statements**, in violation of Title 18, United States Code, Section 1001; **Aiding and Abetting and Causing an Act to be Done**, in violation of Title 18, United States Code, Section 2.)

## FORFEITURE ALLEGATION

25.     Upon conviction of the offenses alleged in Counts One through Three of this indictment, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to this offense, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).   The property subject to forfeiture includes a money judgment equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses alleged in Counts One through Three of this indictment.

26.     If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

22

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the Court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property that cannot be divided without

difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the

value of the property described above, pursuant to Title 21, United States Code, Section 853(p).

(**Criminal Forfeiture,** pursuant to Title 18, United States Code, Section
981(a)(1)(c), Title 28 United Sates Code, Section 2461(c), and Title 21, United
States Code, Section 853(p))

A TRUE BILL

FOREPERSON

Attorney of the United States in
and for the District of Columbia