## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.: 13-100 (ABJ-DAR)** |
| | : | |
| **v.** | : | |
| | : | |
| **JAE SHIK KIM,** | : | |
| **KARHAM ENG. CORP.,** | : | |
| | : | |
| **Defendants.** | : | |

## GOVERNMENT'S OPPOSITION TO THE DEFENDANTS'
## MOTION TO SUPPRESS EVIDENCE

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully moves this Court to deny the defendants' motion to suppress evidence. As discussed below, there is no reason to suppress the evidence because the laptop computer belonging to defendant Jae Shik Kim (from which much of the evidence was obtained) was searched pursuant to the government's broad authority to conduct suspicionless searches at the international border. Moreover, even if the Court were to determine that reasonable suspicion was required before defendant Kim's laptop could be searched, such reasonable suspicion existed in this case.

## FACTUAL BACKGROUND[1]

In early 2011, federal agents from Homeland Security Investigations, in San Diego, CA, were investigating a Chinese national named Bin Yang to determine whether he was attempting to illegally acquire U.S. military technology, and/or commercial technology, without the required license from the federal government. Yang was attempting to purchase accelerometers manufactured by a U.S. company and sell them to Iranian customers, in violation of U.S. laws,

---

[1] The government expects to elicit the facts described below during the motions hearing.

including sanctions against Iran.[2] That investigation resulted in federal criminal charges against Yang in the Southern District of California, and he was arrested overseas, in January 2012, and brought to San Diego for prosecution.

After his arrest, in October 2012, Yang informed federal agents that he had previously purchased accelerometers manufactured by Honeywell Aerospace, a U.S. company, from a South Korean friend, whom he identified as J. S. Kim, the defendant.   Specifically, Yang admitted that he bought six QA-2000 accelerometers from Kim, and that he paid Kim through a wire transfer.  Yang said he believed the transaction occurred sometime in 2008 or 2009, and that Kim had the accelerometers shipped to him in China, from California.  Yang said that he then sold the accelerometers to his Iranian customers.   Yang informed the agents that he communicated with Kim through email.

The agents were familiar with Kim's name because it had come up during their undercover investigation of Yang.  During that investigation, undercover agents communicated with Yang because he wanted to purchase Honeywell QA-3000 accelerometers from the agents. Yang did not realize the agents were law enforcement agents.  The agents obtained an email, dated April 1, 2011, that Yang sent to Kim.  Yang addressed Kim as "Uncle Kim" and sent the email to email address "JS@karham.co.kr."   In that email, Yang asked Kim, who soon would be traveling to the U.S., if Kim would meet with a potential supplier of QA-3000 accelerometers and if they were okay, purchase the accelerometers for Yang.

On April 4, 2011, Yang sent the undercover agent an email stating that his "uncle" was taking a trip to the U.S. and he might meet with the undercover agent and pay for the accelerometers.  Then, on April 5, 2011, Yang and the undercover agent spoke on a recorded

---

[2] Accelerometers can be used in aerospace applications such as the navigation systems in aircraft and missiles.  They are designated as "defense articles" by U.S. laws, and cannot be exported from the U.S. without a license from the federal government.

phone call.  Yang said that his uncle was in Korea and would be traveling to the U.S. around

April 8th.  Yang said that his uncle could view the accelerometers and pay for them, but since his

uncle was "not in this business," and was traveling for personal reasons, Yang did not want his

uncle to carry the accelerometers through the airport because he could face troubles with

customs.

In June 2011, the investigating agents were able to identify the man Yang referred to as

his "uncle" as Jae Shik Kim, a national of South Korea.  They also identified his employer as

Karham Eng. Corp., in Seoul, South Korea.  Records also revealed that Kim traveled from Japan

to the Los Angeles International Airport (LAX), in California, on April 2, 2011.  Kim left LAX

and traveled to Japan, on April 14, 2011, on Korean Airlines.

Based upon the information Yang provided about Kim after Yang's arrest, as well as the

information about Kim obtained during the investigation of Yang, Homeland Security

Investigations (HSI) Special Agent (SA) Hamako decided to conduct a border search of Kim

when he returned to the U.S.  Kim did, in fact, return to the U.S. in November, 2012.  The border

search took place on or about December 5, 2012,[3] when Kim was about to board a flight from

LAX to Japan, and then the ultimate destination, Seoul, South Korea.

After Kim walked onto the jetway, about to board the airplane to leave the United States,

SA Hamako approached him and asked what items he was carrying in his bag.  The agent

showed Kim some o-rings that he had removed from Kim's checked luggage, and asked some

questions.  The agent then asked Kim what he was carrying in his briefcase, and Kim indicated

---

[3] The date of the border search has been reported in separate law enforcement documents as
having occurred on either December 5, 2012 or December 6, 2012.  A Report of Investigation,
dated December 11, 2012, indicates that the border search occurred on December 5th.  The search
warrant that was obtained for defendant's laptop reports the date of the border search as
December 6th.  The actual date of the border search is not critical to the Court's decision on the
motion to suppress.  For purposes of this motion, the government will assume the border search
took place on December 5, 2012.

that he had a laptop computer.  The agent asked Kim to remove the laptop and leave it with the agent.  The agent provided Kim with a business card and told Kim that the laptop should be returned to Kim in a week or so.  Kim was permitted to board his plane and he departed the United States to return to South Korea.

The following morning, December 6, 2012, SA Hamako submitted the laptop to the HSI San Diego Computer Forensics Group for a border search of the computer.  The following day, December 7, an HSI Certified Forensic Agent (CFA) created a forensic image of the laptop's hard drive.  The CFA then reviewed the allocated files on the laptop and exported the emails and other allocated files onto a laptop for SA Hamako to review.  SA Hamako gave the CFA keywords to help filter those files.  The CFA bookmarked the keyword matches, exported the matching files to a DVD, and gave the DVD to the case agent for review.

The files reviewed by SA Hamako contained numerous email conversations between Kim and Yang.  Many of the emails provide evidence of the charges against the defendants in this case because they demonstrate that Kim knowingly assisted Yang in obtaining Honeywell accelerometers for export and sale to Iranian customers, in violation of federal laws.  The conspiracy by Yang and Kim to purchase QA-2000 accelerometers started when Yang sent the following email to Kim on December 20, 2007:

> One Iran friend needs 30pcs QA 2000 accelerometer very urgently.  You know, American is making troubles to them, they can't get it directly.  And I remember that you have relation with IDEX [a U.S. company], could you please get the quotation or equal product price in a short time.

Based on a Shippers Export Declaration obtained by the government, it appears that the accelerometers Kim purchased for Yang were shipped from the U.S., by Apex Components, to Karham Eng. Corp., in Seoul, South Korea on April 4, 2008.[4]

## LEGAL ARGUMENT

### A. The laptop was properly searched pursuant to the government's border search authority

The Fourth Amendment provides that searches of persons and property without a search warrant are generally unreasonable, unless a recognized exception to the warrant requirement is applicable. One recognized exception to the warrant requirement is the government's right to conduct suspicionless searches of individuals and property at our international border.

It is a fundamental principle that "[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border. '[S]earches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border.'" *U.S. v. Flores-Montano*, 541 U.S. 149, 152-53 (2004) (quoting *U.S. v. Ramsey*, 431 U.S. 606, 616 (1977)); *see also U.S. v. Hassanshahi*, 2014 WL 6735479, *11 (D.D.C. Dec. 1, 2014). Furthermore, there is no doubt that the U.S. government has a strong interest in protecting its borders by ensuring that contraband – for example, undeclared currency over a certain amount, or weapons, or certain technology that requires a

---

[4] On June 21, 2011, SA Hamako searched U.S. Department of State records and found a non-immigrant visa application for Jae Shik Kim, with an email address "JS@karham.com". The application listed Kim as President of Karham, in Seoul, South Korea. The application included a California phone number, beginning with area code "661". That same phone number is listed to Apex Components, in California.

SA Hamako also searched the Shippers Export Declarations (SEDs) that must be filed when various products are exported from the U.S. There were 39 SEDs for Karham for products, mostly described as "meters" that were shipped to Australia and Korea. There were 8 SEDs for Apex Components for items such as meters and motor parts that were shipped to South Korea.

license for exportation – does not leave the country illegally. "Because searches at the international border of both inbound and outbound persons or property are conducted 'pursuant to the long-standing right of the sovereign to protect itself,' they generally require neither a warrant nor individualized suspicion." *U.S. v. Seljan*, 547 F.3d 993, 999 (9th Cir. 2008) (quoting *Ramsey*, 431 U.S. at 616).

The search of defendant Kim's laptop was conducted pursuant to the border search authority outlined above, and thus did not require any level of suspicion or a search warrant.  SA Hamako encountered the defendant when he was on the jetway, after the defendant had passed the ticket agent, and on his way to boarding his plane.[5]  During his conversation with Kim, SA Hamako took custody of the defendant's laptop computer and a few other items of equipment.

There is no question that federal agents can search property such as cars, letters and other containers at the border.  *See, e.g., U.S. v. Boumelhem*, 339 F.3d 414, 423 (6th Cir. 2003)(large cargo container properly searched before leaving the U.S., pursuant to border search authority codified at 19 U.S.C. § 1581, because "the United States's interest in preventing the export of weapons to other countries also implicates the sovereign's interest in protecting itself.").  The detention of defendant Kim's laptop computer was justified under this same border search authority.  The laptop was an item of personal property, and therefore subject to being searched – just as any other piece of personal property could be searched at the border.  In short: electronic media are properly included within the definition of "cargo" found in 19 U.S.C. § 1581; "[t]o hold otherwise would undermine the long-standing practice of seizing goods at the border even when the type of good is not specified in the statute."  *U.S. v. Ickes*, 393 F.3d 501, 504 (4th Cir.

---

[5] Once someone enters the jetway in order to board the plane, they have demonstrated their intent to cross the border and leave the U.S.  *See U.S. v. Hernandez-Salazar*, 813 F.2d 1126, 1135 (11th Cir. 1987)("When appellant stepped onto the jetway preparing to board the plane he had 'unequivocally manifested an intention to leave the United States.'") (quoting *U.S. v. Rojas*, 671 F.2d 159, 163 (5th Cir. Unit B 1982)).

2005) (citing *U.S. v. Flores–Montano*, 541 U.S. 149, 153-54 (2004); *U.S. v. Roberts*, 274 F.3d

1007, 1016 (5th Cir.2001); *U.S. v. Caminos*, 770 F.2d 361, 363 (3d Cir.1985)). *See also U.S. v.*

*Stewart*, 729 F.3d 517, 524-26 (6th Cir. 2013) (border search of laptop computers was proper).

### B. Although not required, reasonable suspicion clearly justified the search of defendant Kim's laptop computer

In this case, the defendants argue in favor of imposing a particular limitation upon the

government's use of its border search authority – that is, the requirement of reasonable suspicion

to justify searching the laptop.

The Supreme Court has indeed required a showing of reasonable suspicion in one limited

circumstance:  the border search of a woman who was suspected of smuggling drugs in her

alimentary canal.   In that case, *U.S. v. Montoya de Hernandez*, 473 U.S. 531 (1985), the

defendant was detained for 16 hours to wait for her bowels to move to see if she was concealing

narcotics.   The Court ruled that although "[r]outine searches of the persons and effects of

entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant,"

*Id.* at 538, given the length of detention in this case, and the "uncomfortable" and "humiliating"

ordeal the defendant endured, *Id.* at 544, a reasonable suspicion standard would be applied to

justify the defendant's border search and detention.   Thus, generally, border searches that are

highly intrusive searches of individuals, or that are destructive or  particularly offensive, may

need to be supported by reasonable suspicion. *See Flores–Montano*, 541 U.S. at 152; *Cotterman*,

709 F.3d at 973 (Callahan, J., concurring in part, dissenting in part, and concurring in judgment);

*U.S. v. Arnold*, 533 F.3d 1003, 1009 (9th Cir. 2008).[6]

---

[6] There is no allegation that defendant Kim's laptop was destroyed by the search.  So that circumstance is inapplicable here.

The search of defendant Kim's laptop was not a highly intrusive search of a person.  No matter how intrusive the search of a laptop might be, it is a search of an electronic device, not a person.  In *Flores-Montano*, the Court ruled that there was no need for reasonable suspicion to justify the border search of a vehicle where the gas tank was removed during the search.  No matter how intrusive the search may have been, since the search involved a vehicle, the privacy interests and concerns for dignity that might apply in the search of a person were inapplicable and thus there was no reason to apply a reasonable suspicion standard.[7]  *Flores–Montano*, 541 U.S. at 155. The same is true in this case.  Kim's laptop was searched – not defendant Kim.  As Judge Callahan said in her *Cotterman* concurrence: "'papers,' even private ones in electronic format, are not a 'person.'" *Cotterman*, 709 F.3d at 973.  "[I]n the unique context of border searches, property is property and we may not chip away at the government's authority to search it by adopting a sliding scale of intrusiveness.  It's the border, not the technology, that 'matters.'"

---

[7] As explained by the Court in *House v. Napolitano*, 2012 WL 1038816 (D. Mass. 2012) (plaintiff's laptop computer seized at the border, detained for 49 days and searched during that time period):

> [A] search of a laptop computer or other electronic devices does not involve the same 'dignity and privacy interests' as the 'highly intrusive searches of the person' found to require some level of suspicion such as strip searches or body cavity searches.  *Flores-Montano*, 541 U.S. at 152.   The Supreme Court has not explicitly held that all property searches are routine or that such searches are categorically incapable of implicating the 'dignity and privacy interests of the person being searched,' *id.*, but the search of one's personal information on a laptop computer, a container that stores information, even personal information, does not invade one's dignity and privacy in the same way as an involuntary x-ray, body cavity or strip search of person's body or the type of search that have been held to be non-routine and require the government to assert some level of suspicion.

*House v. Napolitano*, 2012 WL 1038816 at *7.

*Id.* at 976 (Callahan, J., concurring in part, dissenting in part, and concurring in judgment) (citations omitted).

As discussed above, the fact that the border search of a laptop should be treated like border searches of other containers or property is further supported by the *Ickes* case. In that case, the defendant was crossing the Canadian border into the U.S. when his van was searched. The search included a search of his computer and disks, which were discovered to contain child pornography. The Court ruled that the computer should be considered like other "cargo" that was subject to being searched at the border. *Ickes*, 393 F.3d at 504. Therefore, to the extent the search of the defendant's laptop was "intrusive," that still does not support application of a reasonable suspicion standard because the search did not involve a person. [8]

The defendants argue that SA Hamako did not conduct a "routine" border search of Kim's laptop. In other words, the defendants contend, the laptop was subjected to a non-routine, forensic search, which "intrude[d] upon privacy and dignity interests to a far greater degree than a cursory search at the border." Defendants' Brief (ECF Doc. No. 35 at p. 12), quoting *Cotterman*, 709 F.3d at 966. The defendants suggest that a routine search in this case might have occurred if SA Hamako had turned on Kim's laptop while they were on the jetway, and perused it for incriminating information for a limited time. Instead, SA Hamako submitted the laptop to a forensic examiner, who continued the border search. Put another way, the defendants argue that

---

[8] In their brief (ECF Doc. No. 35 at 13, fn. 7), the defendants cite *Riley v. California*, 134 S.Ct. 2473, 2489-92 (2014), suggesting that there is a heightened privacy interest in modern electronic devices like cell phones and laptops because they may contain so much information. But the reasoning in *Riley* should not apply in the border search context. Whereas *Riley* held that the government's interests in conducting searches incident to arrest were diminished in the context of cell phone searches, the same cannot be said for similar searches conducted pursuant to the government's plenary border-search authority. Upholding the search of Kim's laptop here, even after *Riley*, reflects only that "extensive searches at the border are permitted, even if the same search elsewhere would not be." *Ickes*, 393 F.3d at 502.

the search of the laptop was particularly offensive, and therefore the search should not have occurred unless there was reasonable suspicion to justify the search.

The defendants' position is essentially the same as the defendant's in the *Hassanshahi* case. As in *Hassanshahi*, the defendants here rely primarily on *Cotterman* and *U.S. v. Saboonchi*, 990 F.Supp. 2d 536 (D. Md. 2014) (reasonable suspicion existed for a border stop that resulted in the forensic examination of a laptop computer), for the proposition that a border search that involves the forensic examination of a laptop computer must be supported by reasonable suspicion.

Unlike the facts before Judge Contreras in *Hassanshahi*, the instant search should not be considered "forensic" as instructed by the *Cotterman* court.[9] For example, in *Cotterman*, the court described a forensic search as one which is "essentially a computer strip search" that "comprehensively analyzed" the "unallocated space . . . where the computer stores files that the user ostensibly deleted," which "took days" to accomplish. *See Cotterman*, 709 F.3d at 961, 965-66. In the instant case, SA Hamako submitted the laptop for forensic imaging. That process makes an exact physical copy of the hard drive or other media; the image captures all of the data on the hard drive or other media to preserve the contents of the device in the same state as it was when it crossed the border throughout the performance of the border search, without the data being viewed and without changing the data in any way. Although the forensic image may have copied the laptop's hard drive, including the unallocated spaces, at no point was the unallocated space searched, nor did the forensic examiner provide any information from the unallocated spaces to SA Hamako. The subsequent search only accessed data which SA Hamako — or defendant Kim — could have accessed manually. To characterize the mere imaging of a device

---

[9] The defendants rely on *Saboonchi*, a district court case in another jurisdiction. As will be discussed later herein, the search of Kim's laptop took place entirely within the Ninth Circuit; therefore their reliance on *Cotterman* seems more well-founded.

as a "forensic search" within the meaning of *Cotterman* would deprive the government of its ability to expeditiously return electronic media to international passengers, while briefly detaining electronic media images.

Were the defendants' argument to prevail, an individual crossing the border who hides contraband on a laptop computer with password protection, or encrypted files, or in areas of the hard drive not easily discovered by an officer searching at the border, would receive greater Fourth Amendment protections than an individual who carried the same contraband across the border in a suitcase, or on a computer with no password protection or other measures to secure it from a search.

Whether this Court chooses to follow Judge Contreras' approach from *Hassanshahi*,[10] or in the alternative believes that the search was indeed forensic, and applies the Ninth Circuit reasonable suspicion standard,[11] the result would be the same.  SA Hamako had reasonable suspicion to detain defendant Kim's laptop and submit it for a forensic evaluation.

_____

[10] In *Hassanshahi*, Judge Contreras also observed that he should first determine whether reasonable suspicion existed.  Because reasonable suspicion did exist, Judge Contreras declined to decide the constitutional question of whether the forensic examination **required** reasonable suspicion because that question was moot, and deciding it would have been "imprudent" and unnecessary.  *Hassanshahi*, 2014 WL 6735479 at *12, fn. 1.  Therefore, this Court need not decide whether reasonable suspicion was actually required to justify the forensic evaluation.

[11] No case law from this jurisdiction compels the conclusion that reasonable suspicion is required for a forensic search of electronic media; this was specifically the unnecessary finding that Judge Contreras sought to avoid in *Hassanshahi*.  The government would submit that even if this Court were to find that the instant search was "forensic," as contemplated by *Cotterman*, that Ninth Circuit jurisprudence would control in this instance given that the search and image of the media occurred entirely in California.  This stands in stark contrast to *Hassanshahi*, in which the media was merely copied in California and shipped to Sterling, Virginia for analysis. While there is little case law on the matter, the few courts to have addressed inter-circuit conflicts of law have embraced a "lex loci" (the "law of the place") approach in determining that the law of the jurisdiction in which the search or arrest occurred is what controls.  *See, e.g., U.S. v. Restrepo*, 890 F.Supp. 180, 191 (E.D.N.Y. 1995).

As explained in *Hassanshahi*, reasonable suspicion exists when an agent has specific and articulable facts which indicate criminal activity may be occurring.   The totality of the circumstances must be considered, along with the reasonable inferences drawn from them. Reasonable suspicion does not rule out the possibility of innocence.  *Id.* at *12.  Furthermore, "reasonable suspicion sets a 'low threshold,'. . . and requires only a 'minimal level of objective justification.'"  *Id.* at *16 (citations omitted).

The defendants' claim that the agents could not have had reasonable suspicion because the crime Yang admitted committing with Kim occurred several years earlier.  However, that argument has no merit.

SA Hamako clearly had reasonable suspicion for conducting a border search of defendant Kim and his laptop computer.  That reasonable suspicion was based on several factors.  The most significant factor was that Bin Yang informed law enforcement agents that Kim conspired with him to purchase Honeywell accelerometers approximately four years earlier.  A person's past criminal history can weigh heavily in favor of finding reasonable suspicion to believe the person is currently engaging in criminal activity.  *See Hassanshahi*, *id.* at *14 (criminal investigation showing that defendant had attempted to engage in illegal business with Iran approximately 8 years before the border search of his laptop supported finding of reasonable suspicion); *Cotterman*, 709 F.3d at 957 (defendant's 15 year old conviction for child molestation weighed in favor of finding reasonable suspicion that he was carrying child porn on his laptop). Yang's admission that he previously conspired with Kim to illegally export accelerometers created reasonable suspicion that Kim had been, and perhaps still was, involved in illegal activity.

Moreover, SA Hamako knew that Yang had solicited Kim's assistance in purchasing Honeywell QA-3000 accelerometers in April 2011, which was even more recent than the earlier

transaction.  It is immaterial that Kim may not have followed through with Yang's request to meet with the undercover agent to check out the accelerometers in connection with the undercover operation.  SA Hamako could reasonably infer that Kim could be working with Yang, or someone else, on illegal transactions that did not involve the undercover operation.

SA Hamako also knew that Kim was the president of a business, i.e., Karham Eng., which had some history of exporting items from the United States.  The agent's review of Shippers Export Declarations for Karham and Apex Components provided evidence that Kim knew how to facilitate exports from the U.S.  The agent also knew from his professional experience that simply because a shipper declares he is shipping legitimate articles does not always make the declaration true.[12]  Kim's ability to facilitate the exportation of goods and technology from the U.S. not only supported Yang's allegation that Kim had arranged the purchase and exportation of the Honeywell QA-2000 accelerometers several years earlier, but also supplied reasonable suspicion that Kim still could be engaging in illegal exports at the time he visited the U.S. when the border search occurred.

Although it was possible that Kim was traveling for purely legitimate personal or professional reasons, his travel must be considered in context – knowing that he helped export accelerometers from the U.S. only four years earlier.  Therefore, the fact that Kim previously traveled to the U.S. – particularly at the time Yang wanted his help to purchase the QA-3000 accelerometers -- provided the agents with reason to suspect that he could have been traveling to help facilitate the illegal exportation of accelerometers when he returned to the U.S. in 2012. See

---

[12] A case in point is the SED filed for the accelerometers Kim purchased for Yang.  That SED describes an export on April 4, 2008, from Apex Components Co., to KaRham Eng. Corp. in Seoul, South Korea. The declared quantity was six aeronautical instruments, the weight was 1 kilogram, and the declared value was $28,080.  However, the SED also stated that KaRham Eng. Corp. was the "Ultimate Consignee" and that no license was required.  Those last two statements were untrue because Yang's Iranian friends were the ultimate consignee and a license was required before the accelerometers could be exported.

*Hassanshahi*, *id.* at *16 (possibly innocent travel to Iran had to be considered in the totality of the circumstances).   The agents could reasonably suspect that Kim's travel to the U.S., in November and December 2012, could have included the facilitation of the export of accelerometers – if not for Yang, who had been arrested -- then for someone else.

Finally, the o-rings that SA Hamako had removed from Kim's checked luggage also contributed to his reasonable suspicion that Kim was engaging in criminal activity.   At the time of his encounter with Kim on the jetway, SA Hamako did not know whether those commodities required a license before leaving the U.S., and therefore his suspicion about whether Kim was engaging in criminal activity was increased.   Moreover, the mere presence of the o-rings in Kim's luggage made it clear that Kim was not in United States for purely personal reasons; rather, at least one motivation for his travel was business purposes.

Since Kim admitted that he was in possession of a laptop during the encounter, SA Hamako could reasonably suspect that Kim had used the laptop to communicate about his potentially illegal activities, both ongoing and past illegal activities. Yang had informed agents that he communicated with Kim by email, and it is common knowledge that laptop computer hard drives can retain information and data, including incriminating emails, for years.   Therefore, SA Hamako had reason to suspect that Kim would be crossing the border with a laptop that still contained evidence of his earlier criminal conspiracy with Yang, as well as any recent illegal activities.

Although the United States need not demonstrate reasonable suspicion in order for this Court to deny the defendants' motion to suppress, these factors, considered together with the rational inferences that could be drawn from them, provided SA Hamako with reasonable suspicion for conducting the border search of Kim's laptop computer.

Were the defendants' argument to prevail, an exception would be created requiring heightened suspicion for travelers carrying more information than other travelers – for example, on a laptop rather than in a suitcase – or for someone with more technical expertise, who can hide or protect their information on a laptop.   Allowing forensic examinations of laptops to be conducted without a reasonable suspicion requirement will serve the purposes of border searches by allowing the nation to protect its borders more efficiently.   Certainly, the United States has a strong interest in disrupting and detecting crimes that are committed with computers, whether those computers are entering or leaving the country.   *Cf. Boumelhem*, 339 F.3d at 423 ("[T]he United States's interest in preventing the export of weapons to other countries also implicates the sovereign's interest in protecting itself.").

At the same time, an individual's expectation of privacy in his or her laptop computer will not be unduly compromised because "the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior."   *Montoya de Hernandez*, 473 U.S. at 538.   There are "important security concerns that prevail at the border.   The government's authority to protect the nation from contraband is well established and may be 'heightened' by 'national cris[es],' such as smuggling of illicit narcotics, . . . the current threat of international terrorism and future threats yet to take shape." *Cotterman*, 709 F.3d at 966.

In this case, the government acted properly and lawfully by detaining, searching, and ultimately seizing defendant Kim's laptop computer.  Accordingly, the defendants' motion to suppress evidence should be denied.

Respectfully submitted,

RONALD C. MACHEN JR.
United States Attorney

By:    _____/s/_____
       Frederick W. Yette, DC Bar 385 391
       Assistant United States Attorney
       555 4th Street, N.W.
       Washington, D.C.  20530
       (202) 252-7733
       Frederick.Yette@usdoj.gov