```
 1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3   United States of America,    )
                                  )  File No.  13-CR-100
 4                Plaintiff,      )
                                  )  Date:  April 8, 2015
 5           v.                   )  Time:  1:00 p.m.
                                  )
 6   Jae Shik Kim,                )
     Karham Engineering Corp.,    )
 7                                )
                  Defendants.     )
 8
     _____
 9
                   TRANSCRIPT OF MOTIONS HEARING
10                        HELD BEFORE
              THE HONORABLE AMY BERMAN JACKSON
11                    UNITED STATES JUDGE

12   _____

13   APPEARANCES:

14   For the Plaintiff:   Frederick Walton Yette
                          Michael Justin Friedman
15                        U.S. Attorney's Office
                          Criminal Division
16                        555 Fourth Street, NW
                          Washington, DC 20530
17
     For the Defendants:  David B. Deitch
18                        Ifrah, PLLC
                          1717 Pennsylvania Avenue, NW
19                        Suite 650
                          Washington, DC 20006
20
     Court Reporter:      Janice E. Dickman, RMR, CRR
21                        Official Court Reporter
                          U.S. Courthouse, Room 6523
22                        333 Constitution Avenue, NW
                          Washington, DC 20001
23                        (202) 354-3267

24                           *   *   *

25
```

1                          INDEX

2

3    DAVID MARSHALL
          Direct Examination By Mr. Yette....................... 5
4         Cross-Examination By Mr. Deitch......................23
          Redirect Examination By Mr. Yette....................37
5         Recross-Examination By Mr. Deitch....................41

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Whereupon the interpreters were duly sworn.)

2              THE COURTROOM DEPUTY:  Good afternoon, Your Honor.

3     Calling criminal case number 13-100, the United States of

4     America v. Jae Shik Kim and Karham Engineering Corporation.

5     The defendant is present in the courtroom, Your Honor.  The

6     interpreters who are present for these proceedings are Miss

7     Simmons and Mr. Park, who have both been sworn for the

8     record.

9              Will counsel for the parties please approach the

10    lectern, identify yourself for the record and the party or

11    parties that you represent.

12             MR. YETTE:  Good afternoon, Your Honor.  Frederick

13    Yette and Michael Friedman for the government.

14             THE COURT:  Good afternoon.

15             MR. DEITCH:  Good afternoon, Your Honor.  David

16    Deitch for the defendants.  And my colleague Sarah Koch is

17    with me.

18             THE COURT:  Good afternoon.  And I understand that

19    we have a witness who is on the phone.

20             Can you hear us, sir?

21             THE WITNESS:  Yes, ma'am.

22             THE COURT:  All right.  Why don't we go ahead and

23    swear the witness, then.

24             MR. YETTE:  Your Honor, one thing prior to that,

25    if you think it's advisable, we would ask that you just

1   inform the defendant this is how we're proceeding, so that

2   if it became relevant later, there wouldn't be a

3   confrontation issue because the witness is not present in

4   the courtroom.

5           THE COURT:  Well, I believe defense counsel

6   yesterday specifically agreed, on the defendant's behalf, to

7   this witness testifying by phone, is that correct?

8           MR. DEITCH:  That is.  And I have consulted with

9   Mr. Kim and he's satisfied to proceed this way.

10          THE COURT:  All right.  Thank you.

11          MR. YETTE:  Thank you, Your Honor.

12          THE COURT:  All right.  Is it special Agent

13  Marshall?

14          THE WITNESS:  Yes, ma'am.

15          THE COURT:  I think you need to get a little

16  closer to your phone so that we can hear you a little better.

17          THE WITNESS:  Okay.  How's that?

18          THE COURT:  That's much better.  And now the

19  courtroom deputy is going to administer the oath and then

20  the prosecutor is going to ask you questions, just as if you

21  were here on the stand, and then the defense attorney will

22  have the opportunity to ask you questions.

23          All right.  Mr. Haley.

24          THE COURTROOM DEPUTY:  Will the witness please

25  raise his right hand.

1              DAVID MARSHALL,

2    was called as a witness and, having been first duly sworn,

3    was examined and testified as follows:

4              THE COURT:  All right.  Go ahead, Mr. Yette.

5                      DIRECT EXAMINATION

6    BY MR. YETTE:

7    Q.  Good afternoon, sir.  This is Frederick Yette for the

8    government.

9              Will you please identify yourself for the record

10   and tell us where you work?

11   A.  I'm a special agent, David Marshall.  I work as a

12   special agent for the Department of Homeland Security,

13   Homeland Security Investigations, in San Diego, California.

14   Q.  And just briefly, can you describe your -- well, how

15   long you've been with Homeland Security?

16   A.  I've been a special agent for 12 and a half years and

17   I'm currently assigned as a computer forensics agent and

18   I've been doing that for eight years.

19   Q.  And as a forensic computer agent, have you conducted

20   forensic examinations of computers?

21   A.  Yes.

22   Q.  Does that include laptop computers?

23   A.  Yes.

24   Q.  As well as cell phones?

25   A.  Yes.

1    Q.  And could you estimate, approximately, how many forensic

2    exams of laptop computers or computers you've conducted?

3    A.  I went back to 2010.  And since 2010 I've conducted over

4    300 examinations of computers and hard drives.

5    Q.  Since 2010?

6    A.  Correct.

7    Q.  What about cell phones?

8    A.  Over 800 cell phones.

9    Q.  Now, you've previously provided me, yesterday, with a

10   copy of your curriculum vitae, is that correct?

11   A.  Yes.

12           MR. YETTE:  Your Honor, the defense was willing to

13   stipulate to putting in the CV for Agent Marshall and then

14   stipulating that he's an expert in the forensic examination

15   of computers.  I can ask a few more questions, but --

16           THE COURT:  Do you have any objection to his being

17   qualified as an expert?  I didn't realize we were calling

18   him as an expert.  I thought we were calling him as a fact

19   witness.

20           MR. DEITCH:  That was my assumption.  Mr. Yette

21   mentioned this issue and I told him -- I suggested that

22   stipulation as a way of making the hearing move along a

23   little more quickly.

24           THE COURT:  All right.

25           MR. YETTE:  I could ask more questions, if that

```
 1    would --
 2              THE COURT:  No, I'm not worried about his
 3    expertise.  I just wasn't sure whether we're asking him
 4    questions in his capacity as a fact witness who did things
 5    to this computer, about what he did, or whether you're going
 6    to be asking for his expert opinion about matters.
 7              MR. YETTE:  There are some --
 8              THE COURT:  For purposes of the record, has the
 9    CV -- can you mark it as an exhibit and move it in evidence?
10              MR. YETTE:  Sure, sure.  This is the CV.  It's
11    Government Exhibit 4.
12              THE COURT:  Based on that, I'm willing to find
13    that he is qualified as an expert, but I just don't know
14    that we're going to get to the point where we're actually
15    asking questions for which that matters.  We'll find out.
16              MR. YETTE:  Thank you, Your Honor.
17    BY MR. YETTE:
18    Q.  Agent Marshall, just for the record, have you testified
19    as an expert witness in prior cases?
20    A.  Yes.
21    Q.  About how many times?
22    A.  Three federal and two state cases.
23    Q.  Now, were you working in San Diego on December 6th, 2012?
24    A.  Yes.
25    Q.  And did you receive a laptop computer from Special Agent
```

1    Kevin Hamako on that date?

2    A.  Yes.

3    Q.  Can you describe the laptop you received?

4    A.  It was a gray Samsung laptop, good condition.  And a

5    laptop.

6    Q.  Did you have the name of the person associated with that

7    laptop?

8    A.  I was told it was seized from someone with the last name

9    of Kim.

10   Q.  Okay.  Did Agent Hamako ask you to perform any

11   examinations on that laptop?

12   A.  Yes.

13   Q.  Can you describe what you did?

14   A.  Agent Hamako requested a border search of the laptop.  I

15   photographed the laptop to documents its condition.  I

16   removed the hard drive from the laptop.  I then created a

17   forensic image, a duplicate copy of the hard drive.  I

18   reassembled the hard drive into the laptop and returned it

19   to Kevin Hamako on December 7th.

20   Q.  Okay.  Let me ask you, when you said you made a forensic

21   image, explain what that means.

22   A.  I have a piece of hardware, it's about the size of a

23   shoebox, I connect the laptop hard drive to and that creates

24   an exact copy, reading every single bit, as we call it,

25   every single piece of data on the hard drive and making a

1    copy of that for me to analyze later on.

2    Q.   Did you use any kind of software to do that?

3    A.   The software is built into the hardware device that I

4    was using.

5    Q.   Okay.  Now, does that forensic imagine include what are

6    called allocated and unallocated spaces on the hard drive?

7    A.   Yes.  It's an exact copy of the entire hard drive, which

8    would include both.

9    Q.   Can you explain what those terms mean, allocated and

10   unallocated?

11   A.   Allocated space, in general, means space in your hard

12   drive where, you know, files -- files are living, files that

13   you see on your desktop, maybe a photo of a family vacation

14   or Word documents.  Unallocated space refers to space that's

15   not currently being used by -- let's say it's Windows, by

16   Windows for any files.  And when you delete a file, it goes

17   into unallocated space.  So that's basically general --

18   unallocated space is space that's not currently being used

19   by the computer.

20   Q.   Okay.  Now, did you export any files in order for -- to

21   give them to Special Agent Hamako?

22   A.   Yes.  On December 7th I used some software to analyze

23   the forensic image and I exported Excel files, PDF

24   documents, and Microsoft Word documents, along with some

25   e-mail containers, for review.

1    Q.   Okay.   Can you explain what e-mail containers are?

2    A.   This computer was using Microsoft Outlook e-mail.   And

3    e-mail messages are stored in what we call a container.   So

4    if you have 5,000 e-mails, rather than having 5,000 files on

5    your computer, you'll have one large file where all the

6    e-mails are stored inside of that.   So that's what we refer

7    to an as an e-mail container.

8    Q.   How many containers did you export?

9    A.   There were six e-mail containers that were exported.

10   Q.   Do you know the exact number or can you estimate the

11   number of total e-mails exported?

12   A.   No.   I don't have that information.

13   Q.   How many e-mails could a container hold?

14   A.   Outlook is pretty robust.   I mean, you can have

15   thousands of e-mails in an e-mail container.

16   Q.   Now, when you exported the e-mail containers and the

17   other documents, did you use a software program for that?

18   A.   Yes.   I used a program called EnCase to export the files.

19           THE COURT:   E-N-C-A-S-E?

20           THE WITNESS:   Correct.   And then the e-mail

21   containers were processed with a separate -- once they were

22   exported, they were processed with a separate application

23   called Intella.   That is I-N-T-E-L-L-A.

24   BY MR. YETTE:

25   Q.   Okay.   When you exported all of the files, where did you

1    put them for Special Agent Hamako?

2    A.   They were put on a -- what we call a case agent review

3    laptop, which is a laptop that we provide to the case agent

4    for reviewing files.

5    Q.   Can you tell us how many files, different kinds of files

6    were on that case agent laptop?

7    A.   Yes.   These are approximations:   There were

8    approximately 8,000 Excel files -- Excel spreadsheets,

9    11,000 PDF documents, 2,000 Microsoft Word documents, and

10   870 Microsoft PowerPoint files.

11   Q.   When did you give that laptop, the case agent laptop to

12   Agent Hamako?

13   A.   The laptop was given to Agent Hamako on December 10th.

14   Q.   Did he -- what did he do with that laptop?   Or did he

15   come back to you at some point?

16   A.   On December 7th, when I saw the amount of files, I

17   requested a keyword list from Agent Hamako to try and filter

18   down the amount of information for him to review.   He came

19   back on December 10th with the list of keywords and then I

20   filtered the -- those previously referenced files down with

21   the keyword list.

22   Q.   And how many keywords were there?

23   A.   Twenty-two keywords.

24   Q.   And did you preserve those -- that list of words?

25   A.   Yes.

1        THE COURT:  What program enabled you to do that?

2    The EnCase simply did the exporting, is that correct?

3        THE WITNESS:  EnCase also allowed me -- I selected

4    the files that had been exported.  So, I selected those same

5    files and EnCase allowed me to search through them using

6    those keywords.

7        THE COURT:  So is there any other program, besides

8    EnCase, that you used to do the searching for the keywords?

9        THE WITNESS:  No.  That's the only program I used.

10        THE COURT:  Okay.  And I take it that the original

11    laptop did not have the program EnCase on it?

12        THE WITNESS:  No.  That's correct.

13        THE COURT:  Okay.  You can proceed.

14        MR. YETTE:  Thank you.

15    BY MR. YETTE:

16    Q.  So, Agent Marshall, can you -- do you have that list of

17    keywords with you?

18    A.  I do.

19    Q.  Can you read us the keywords, just so they're in the

20    record?

21    A.  You want me to read all 22 keywords?

22    Q.  Well, I have --

23        THE COURT:  Sure.  Yes.

24    A.  Okay.  QA-2000, QA-3000, G-2000, 7270A, accelerometers,

25    gyroscope, angular.

1    BY MR. YETTE:

2    Q.  Can you spell that, please?

3    A.  Angular, A-N-G-U-L-A-R.  Sensor, Honeywell, Endevco,

4    E-N-D-E-V-C-O, Northrop.

5    Q.  Spell that, please.

6    A.  N-O-R-T-H-R-O-P.  Grumman.

7    Q.  Spelling.

8    A.  G-R-U-M-M-A-N.  The word ITAR.

9    Q.  Spell that, please.

10   A.  I-T-A-R.  Sensitive, export, shipment, military,

11   aircraft, missile, satellite, ballistic, and nuclear.

12   Q.  Okay.  Now, when you used those keywords to search the

13   hard drive, what did you -- what result did you come back with?

14   A.  I used the keywords to search only those files that were

15   previously referenced, not the whole hard drive.

16   Q.  Okay.

17   A.  And I came back with approximately 5,900 of those files

18   that had a keyword match.

19   Q.  What did you do with those?

20   A.  Those files were burned onto a DVD and given to Agent

21   Hamako.

22   Q.  Did you give him any other DVD?

23   A.  Yes.  On December 11th -- through my initial review I'd

24   also marked about 24,000 JPG image files.  So I burned those

25   onto a DVD and provided those to Agent Hamako on December 11th.

1    Q.  What kind of files are the JPG files?

2    A.  Those are picture files.

3            THE COURT:  And what do you mean, you'd marked

4    them?  When did you do that?  Using what software?  What

5    were you looking for?

6            THE WITNESS:  On December 7th when I looked --

7    when I marked the Excel files and the PDF files, I also just

8    marked all the allocated JPG files.

9            THE COURT:  Marked all of them?

10           THE WITNESS:  The ones that were allocated, correct.

11           THE COURT:  So, the DVD that you created on

12   December 11th basically was just an exact copy of every

13   single JPG file that had been on the original computer, or

14   were they pictures of particular things?

15           THE WITNESS:  It's not every JPG on the computer.

16   I don't -- I didn't review where all 24,000 came from for

17   this testimony, so I can't answer that question.

18           THE COURT:  But why did you mark the ones you

19   marked?

20           THE WITNESS:  Let's see.  Based on my notes, those

21   are most likely in the user's folder for that laptop.

22   BY MR. YETTE:

23   Q.  Well, let me ask you, did you give Agent Hamako

24   anything, any files from the unallocated spaces on the

25   computer?

1    A.  No.

2            THE COURT:  But I just want to know if you had

3    some sort of search protocol or program or something that

4    you used to pick the JPGs that you marked.

5            THE WITNESS:  No.  Other than just, you know,

6    these are all the JPGs that were in, you know, that -- the

7    user folder on the computer.

8            THE COURT:  Okay.

9    BY MR. YETTE:

10   Q.  Let me ask you this, Agent Marshall:  Once you gave

11   Special Agent Hamako the 5,000 or so files on the DVD and

12   those 24,000 JPG files, did all of those come from allocated

13   spaces on the computer?

14   A.  Yes.

15   Q.  Now, if you assume that Agent Hamako was at an airport

16   looking at this laptop computer, could he have looked at

17   these same files that you gave him?

18   A.  Yes.

19   Q.  Would he have required any special tools at the airport

20   to view those files you gave him?

21   A.  No.

22   Q.  Now, the kind of exam you did on this computer, do you

23   consider that a full forensic examination of the computer?

24   A.  No, I do not.

25   Q.  Can you explain why not?

1    A.   A full forensic exam is -- encompasses a deeper analysis

2    of the computer; user information, user activity, when

3    certain files were created and when they were accessed.  You

4    know, more details like that.  This was a quick, what we

5    would call a document extraction, to get the files out for

6    Agent Hamako to review in a timely manner.

7    Q.   Is this a different kind of search for a border search

8    than for a full examination?

9    A.   Yes.

10   Q.   And which kind were you doing for Agent Hamako?

11   A.   This was a border search.

12   Q.   Did you ever conduct a full forensic examination of the

13   hard drive?

14   A.   No.

15   Q.   Now, Agent Marshall, can you explain how someone would

16   be able to hide documents on a hard drive computer -- or, a

17   laptop?

18   A.   Documents can be hidden in a few different ways.  You

19   can use encryption, you can use something to compress the

20   file, like a zip program or something like that.  If you

21   just want to hide it from an average Windows user using

22   Windows, you can, you know, change the name of the document

23   from a Word document to a text file, then you wouldn't be

24   able to see it.  You know, several ways like that for hiding

25   documents.

1     Q.  And are there -- well, when you say encrypt the

2     document, what does that mean and what does that do?

3     A.  Encryption is a general description for taking a file

4     and scrambling the data inside so it's not readable and

5     protecting it with some type of password so that only, you

6     know, the person with the password can look at the real data

7     inside that file.

8     Q.  Are there ways for a person to kind of booby trap their

9     laptop computer so that if the person who didn't own the

10    computer opened it and tried to look at files, certain files

11    could be deleted or hidden or destroyed in some way?

12    A.  Yes, you can do things like that.

13    Q.  So, let me ask you, if an agent recovers a laptop at the

14    airport, would you advise them to immediately turn on or

15    search the laptop, if it's being seized as evidence?

16    A.  No.

17    Q.  Why not?

18    A.  We don't advise that because that alters the evidence,

19    that's changing data on the computer.  And, like I say,

20    could also lead to possible, you know, data loss.  So we

21    don't advise them to do what we call live preview on a

22    laptop.

23    Q.  If Agent Hamako had turned that laptop on and looked at

24    it at the airport, what would have happened or what could

25    have happened?

1          MR. DEITCH:  Objection.  Calls for speculation.

2          MR. YETTE:  This is why I asked that he be

3    qualified as an expert.

4          MR. DEITCH:  But he needs facts to base his answer

5    on.

6          THE COURT:  Let's not talk about this particular

7    laptop.  Let's say if a laptop is opened by an agent without

8    knowing anything about the laptop, what can happen?

9          THE WITNESS:  Once you open a laptop, you're

10   changing file dates; when, maybe, a file was last accessed.

11   You're also opening files that maybe the person that owned

12   the laptop hadn't opened and so you're changing recently

13   used lists, trying to show -- it would be harder to show

14   later on when files were opened and who was looking at them.

15   BY MR. YETTE:

16   Q.  Would that affect the credibility of evidence?

17   A.  No.  I mean, we can go back and, based on good notes

18   from the agent that was doing live preview, we can try and

19   reconstruct what happened, but it's -- again, it's not the

20   recommended way of previewing because you are -- I mean, if

21   that file had been, let's say, last looked at a week ago and

22   then the agent looked at it that morning, the fact that it

23   was looked at a week ago is gone, we can't really

24   reconstruct that.  So there is data -- possible data loss

25   from looking at a live computer.

1    Q.  Have you received or are you familiar with cases where

2    border searches of laptops are conducted and the agent looks

3    at the laptop there at the border; for instance, an airport?

4    A.  I mean, I'm familiar with CBP inspectors that have

5    looked at the laptops at the border, yes.

6    Q.  Have you examined those computers?

7    A.  We've examined -- we've taken over cases from -- that

8    have been looked at by CBP at the border, yes.

9    Q.  In your experience with HSI agents, do they routinely

10   open up computers at the scene of a border or a crime scene?

11   A.  No.

12   Q.  Why is that?

13   A.  That's not our protocol and that's not what we instruct.

14   If they're going out, if we're not with them, then we try to

15   instruct them beforehand not to open anything up.  If

16   something is turned on, just to turn if off and seal it up

17   and seize it, not to touch it or look around on the

18   computer.

19   Q.  Court's indulgence.

20        Agent Marshall, can you --

21        MR. YETTE:  I don't think I have any other

22   questions at this time, Your Honor.

23        THE COURT:  All right.  Before we move on to

24   defense counsel -- Special Agent Marshall, you were asked

25   earlier whether what you did was a full forensic examination

1      and you very generally talked about a full forensic

2      examination.  I would like you to answer me, in as much

3      detail as possible, and tell me, as you understand it, what

4      a forensic examination of a computer entails.

5              THE WITNESS:  Forensic examination of a computer

6      would entail the -- based on the request from the case

7      agent, the complete analysis of activity on the computer.

8      For example, if we're doing a child exploitation case, that

9      would include user account information, user passwords, when

10     files were downloaded, information on the programs that were

11     used to download files; different movie players, what their

12     activity was; external devices that were connected to the

13     computer that may have been used to transfer files on and

14     off the computer.

15              Maybe a timeline or information on cameras that

16     were used to take, you know, photos that were found on the

17     computer, GPS locations from those photos.  Ownership of the

18     files to where they might have come from previously.

19     Searching for encrypted containers, searching for what we

20     call a zip or an archive file, which is a file that contains

21     multiple files inside.

22              So, basically a deep examination of multiple

23     items, different items on the computer.

24              THE COURT:  But the examination is driven by what

25     it is that the case agent asks you to look for, is that

1    correct?

2            THE WITNESS:  Yes.  The type of the examination is

3    driven by the type of case that it is, and then the

4    parameters given -- supplied by the case agent and the

5    search warrant.

6            THE COURT:  All right.  Well, if you're talking

7    about a case that involves export controls, what would a

8    forensic examination entail?

9            THE WITNESS:  For an export control, that would

10   include some of the same items.  I mean, we would be more

11   focused on documents, e-mails, financial programs, financial

12   databases, shipping -- shipping information, whether that's

13   in some type of database; text documents; again, the same

14   type of encryption, archive files.  We would also be looking

15   for images, in case photographs were taken of notable items

16   or sometimes people scan bills and invoices and save those

17   as pictures.  So similar type of activity, just maybe not as

18   focused on movies and, you know, programs uploaded, download

19   movies, things like that.

20           THE COURT:  I'm losing you, volume wise, a little

21   bit.

22           In terms of the e-mail containers in this case, do

23   you know whether the e-mails that you passed along to the

24   agent by putting them on his review laptop, whether they

25   were previously deleted or archived?  Or does it not make

1    any difference, they just live in the same kind of container?

2          THE WITNESS:  I don't know if there are any

3    deleted e-mails that were recovered out of those containers.

4    That is possible, if you delete an e-mail, sometimes it will

5    stay in the container.  For this case I don't know if any

6    deleted e-mails were processed out of those six containers.

7          MR. YETTE:  Your Honor, may I follow up on that?

8          THE COURT:  Yes.

9    BY MR. YETTE:

10   Q.  Agent Marshall, if you were doing a complete forensic

11   examination, would you have looked to try to determine

12   whether e-mails had been deleted and, I guess, stayed in the

13   container?

14   A.  Yes.  Once, you know, the case agent gave us the

15   parameters, if there was, you know, a request to look for

16   deleted e-mails or, you know, look for notable e-mails, then

17   yeah, we would check that also.

18   Q.  And in a full forensic examination would you have looked

19   in the unallocated spaces?

20   A.  Yes.  We would -- again, based on the request from the

21   case agent, if they were looking for additional information,

22   then we would go into the unallocated and try and recover,

23   you know, documents or pictures or items that they were

24   looking for.

25   Q.  Was that done in this particular case?

```
 1    A.  No.

 2                THE COURT:  Are you aware that ultimately a search

 3    warrant was obtained in this case?

 4                THE WITNESS:  Yes.

 5                THE COURT:  Did you do anything to -- either the

 6    complete image that you had created or the case agent's

 7    laptop, did you do any further searching or application of

 8    any programs after the search warrant was obtained?

 9                THE WITNESS:  No.

10                THE COURT:  All right.  Do you want to cross-examine?

11                MR. DEITCH:  Yes.  Thank you.

12                          CROSS-EXAMINATION

13    BY MR. DEITCH:

14    Q.  Agent Marshall, as -- in response to Mr. Yette's

15    questions, you testified that you are familiar with

16    instances in which Customs and Border Patrol agents have

17    booted up laptops during border searches as passengers were

18    passing through checkpoints, correct?

19    A.  Yes.

20    Q.  And you are aware that there are numerous instances in

21    which CBP agents have discovered contraband on computers in

22    exactly that manner, correct?

23    A.  I'm only aware of the cases that I know of, of laptops

24    that have been turned on.

25    Q.  Okay.  Are you aware that there are cases in which CBP
```

1    agents have discovered contraband when they have asked

2    passengers to turn on laptop computers?

3    A.  Yes.

4    Q.  And are you aware that there are cases in which the

5    discovery of contraband in that manner has led to the

6    prosecution and conviction of those individuals?

7    A.  I believe that's correct, yes.

8    Q.  I'm sorry.  I couldn't hear your answer.

9    A.  Yes, I believe that's correct.

10   Q.  Okay.  And there was nothing about the fact that the

11   computer was powered on that interfered with the ability of

12   the government to pursue those prosecutions, correct?

13   A.  I don't know the specific details of all the cases, but

14   I believe that's generally accurate.

15   Q.  And when CBP agents turn on those computers, they're

16   acting in conformance with the policies of that agency,

17   correct?

18   A.  I'm not aware of the specific CBP policies for border

19   search.

20   Q.  Well, do you believe that when CBP agents do that, they

21   are contravening agency policy?

22   A.  No.  I'm just saying I don't know the specifics of

23   their -- I don't know what their policy is, so -- you asked

24   me about the policy.  I'm saying I don't know what the

25   policy is.

1    Q.   Okay.  You also gave some testimony in response both to

2    Mr. Yette and to the court -- the court's questions about

3    forensic examinations.  The term forensic examination, does

4    that -- that term does not include a specific list of tasks,

5    correct?

6    A.   That's correct.

7    Q.   It is a generalized description that has to do with the

8    examination of the computer using particular kinds of tools,

9    correct?

10   A.   Correct.

11   Q.   So that a forensic examination can involve a wide range

12   of different kinds of analysis of the computer, correct?

13   A.   Yes.

14   Q.   And some of those forensic examinations can be extremely

15   detailed and intrusive, correct?

16   A.   They can be extremely detailed, yes.

17   Q.   And other forensic examinations are still forensic

18   examinations, but they are not nearly as detailed or as

19   thorough of an analysis of the computer's contents?

20   A.   Yes.

21   Q.   And am I also correct that the extent or the particulars

22   of what tasks you do as part of a forensic examination is

23   not driven so much by the particular charges at issue, but,

24   really, by the type of evidence that the case agent is

25   hoping or thinking that he or she might find on the

1    computer, correct?

2    A.   It's driven by the parameters of the search warrant and

3    then the type of case, and then guidance from the case agent.

4    Q.   Okay.  The laptop in this case, the Samsung laptop, it

5    had a password, didn't it?

6    A.   I don't know.

7    Q.   Okay.  When you do your examinations in your office or

8    laboratory, does it matter whether a laptop has a password?

9    A.   No.

10   Q.   Why is that?

11   A.   Because I took a copy of the hard drive, which allows me

12   to analyze the data without needing the user's password.

13   Q.   So is it correct that for a normal user -- or, for a

14   normal case agent standing in a jetway with a laptop, if he

15   or she were to power up a laptop computer that had a

16   password, without the password that case agent could not

17   examine any of the contents of the laptop, correct?

18   A.   So your scenario, the laptop is turned on and comes up

19   to a login screen?

20   Q.   Correct.  Let me rephrase the question.

21            Agent, if Agent Hamako in this case had asked Mr.

22   Kim to power up the laptop standing in the jetway at LAX and

23   Agent Hamako did not have a password that was required to

24   access the laptop, am I correct that he could not see the

25   contents of the laptop?

1   A.  Correct.

2   Q.  And your examination differed from that scenario in that

3   the tools you used permitted you to see the contents without

4   having a password?

5   A.  Correct.

6   Q.  Now, the different tools -- you talked about a couple of

7   the different tools you used and I wanted to ask a couple of

8   questions about those.  The first one is EnCase.  Am I

9   correct that EnCase is a very powerful forensic computer

10  examination tool?

11  A.  Yes.

12  Q.  It has many, many different capabilities?

13  A.  Yes.

14  Q.  So, if, as a user, I wanted to copy my hard drive, how

15  would the copy that I made or the process that I would use

16  to copy the hard drive differ from the way in which EnCase

17  does it?

18  A.  I mean, a user can make an exact -- use Windows and make

19  an exact copy of their hard drive, which would be the same.

20  Or you can use Windows to just copy out your -- you know,

21  your files, so you would not get the unallocated space or

22  the system files.

23  Q.  I'm sorry.  I couldn't hear the end of your answer.

24  A.  You would -- if you're just copying the user files, you

25  would just get your files and not, like, the Windows system

1   files and things like that.

2   Q.  Okay.  And -- I'm sorry.  One moment.  Can you explain,

3   when you talked about using EnCase to export the different

4   files -- let's take, for an example, do you recall that

5   you -- that you bookmarked a number of files of different

6   types?

7   A.  Yes.

8   Q.  When you say that you bookmarked the files, how does

9   EnCase assist you in locating those files?

10  A.  EnCase assists me by allowing me to sort by the type of

11  file.  So I'm able to look at the user's folder and then

12  sort by file type.  So I can see, for example, all the Word

13  documents grouped together.

14  Q.  And when you say all the Word documents grouped

15  together, are you saying all the Word documents on the

16  computer?

17  A.  No, these -- I was looking at the user's folder.  So

18  these are all the -- these aren't, like, Word documents

19  from, you know, a Windows manual or something like that.

20  These are all from the user's folder.

21  Q.  Okay.  If I, as a user, wanted to find all the Word

22  documents on a computer, I could go file -- folder by folder

23  and subfolder by subfolder and look for them, correct?

24  A.  You can also search in Windows.

25  Q.  Okay.  And how -- can you describe how your -- how

1    EnCase searches for those documents, in what way that is

2    different from the way I would search as a normal user?

3    A.   EnCase allows me, like I said, to select all the files

4    in the user's folder and see them all at once and then sort

5    by the file type.  A normal user could, again, use Windows

6    Explorer to search for all Word documents and you would just

7    see a huge list one by one as Windows Explorer found them.

8    So you could still find the same amount of documents, it

9    would just be displayed differently, take longer.

10   Q.   When EnCase identifies a document, for example, as a

11   Microsoft Word document, does it -- well, let me withdraw

12   that.

13         Normally Microsoft Word documents are identified

14   in their file name by the use of a suffix after a period,

15   correct?

16   A.   That is one way to identify a file, correct.

17   Q.   And sometimes that's, for example, .DOC or .DOCX?

18   A.   Yes.

19   Q.   When EnCase identifies a document, for example, as a

20   Microsoft Word document, does it do so based on seeing that

21   suffix or does it -- is it able to see -- in essence, see

22   what the file actually is?

23   A.   It uses both methods.

24   Q.   So that when you talked before in response to Mr. Yette

25   about how a user could hide files, one example you gave is

1    that you could change the suffix so that it would not have a

2    suffix that a normal user would recognize that file as that

3    type of file, correct?

4    A.   Correct.

5    Q.   And one advantage of using EnCase is that it spots that

6    file and it knows what kind of file it is?

7    A.   Correct.

8    Q.   And I've used Microsoft Word as an example.  But the

9    same is true for all the different types of files that you

10   bookmarked, correct?

11   A.   Correct.

12   Q.   Did you use EnCase for exporting those files for the

13   agent's review?

14   A.   Yes.

15   Q.   And does EnCase export the files in a way that is

16   different from the way in which I could copy files from my

17   laptop onto a CD or a DVD?

18   A.   No.

19             THE COURT:  I'm sorry.  Was his answer yes or no?

20             MR. DEITCH:  I think it was no.

21             THE WITNESS:  No.

22             THE COURT:  Okay.  Thank you.

23   BY MR. DEITCH:

24   Q.   The other tool that you mentioned was Intella.  Intella

25   is a commercially available software that allows for

1    analysis of e-mail files, correct?

2    A.   Correct.

3    Q.   And it is also a very powerful piece of software with a

4    lot of different capabilities, correct?

5    A.   Yes.

6    Q.   And one of the reasons for using software -- or,

7    third-party software for examining e-mails is that some

8    kinds of proprietary e-mail files are not text searchable,

9    correct?

10   A.   That's correct.

11   Q.   And what Intella allows is it allows text searching of

12   e-mails that might not otherwise be possible, correct?

13   A.   Yes.

14   Q.   And when you gave the -- excuse me one moment.

15        When you gave the e-mails to Agent Hamako, you had

16   to prepare them in a particular way so that they could be

17   searched with Intella, correct?

18   A.   They were processed with Intella, correct.

19   Q.   And can you describe what is involved, what Intella does

20   to process the e-mail containers so that they can be

21   searched?

22   A.   Like I said previously, an e-mail container can contain

23   thousands of e-mails.  So Intella will go through and open

24   up the e-mail, and what we call index and categorize the

25   e-mail.  So it looks at all the e-mail information, the to

1    and the from, the dates, things like that, the attachments,

2    and it processes those and categorizes all that information

3    so that the user can then go in and see all the e-mails from

4    a certain person, you know, or to a certain person or on a

5    date.  So it's -- it's indexing all the e-mail that are in

6    those containers.

7    Q.  Okay.  So by processing the e-mails so that they can be

8    searched with Intella, you give the case agents capabilities

9    that he or she would not otherwise have in searching those

10   e-mails, correct?

11   A.  I mean, you can do the same type of searching in

12   Outlook.  You can search for to and from and dates and

13   attachments.  You can do similar searching in Outlook, it's

14   slower and there's no relationships that are shown.

15           THE COURT:  Well, you can search that way in

16   Outlook, but was what you passed along to the agent already

17   tagged and marked and indexed and organized that way?

18           THE WITNESS:  You could do the same searching in

19   Outlook.  Intella allows you to do relationships.  So, for

20   example, Intella, you can search for the word apple, you can

21   search for the word orange, and then Intella will then also

22   show you e-mails that have both apples and oranges in the

23   same e-mail, where you can't really do that with Outlook.

24   BY MR. DEITCH:

25   Q.  And I think the judge's question was:  When you sent the

1    information to Agent Hamako, you had already prepared the

2    data as an Intella case, correct?

3    A.   Correct.  Yes, it was already preprocessed with Intella.

4    Q.   So, in other words, when Agent Hamako searched it, he

5    would have been searching it using the Intella program?

6    A.   Correct.

7    Q.   You testified earlier that you -- and I try -- I'm

8    paraphrasing your testimony, so correct me if I didn't get

9    it exactly correct.  That you requested keywords from the

10   agent because of the number of files.  Can you explain, what

11   was it about the number of files that led you to request

12   keywords from the agent?

13   A.   Again -- you know, I was going to provide him, like I

14   said, about 8,000 Excel files and 2,000 Word documents,

15   which would be a lot of data to look through manually.  So I

16   asked for the keywords to try to reduce those number of

17   files to look through and to help try and target him on the

18   documents that were relevant to what he was -- what he was

19   looking for.

20   Q.   And when you searched the -- when you talked about

21   searching for those keywords, did you search the e-mails or

22   only the other file types?

23   A.   Only the other file types.

24   Q.   And when you searched those other file types, you did

25   that with EnCase?

1    A.  Correct.

2    Q.  And how was -- how was the way in which EnCase searches

3    for those keywords different from the way that a normal

4    computer user might search for keywords?

5    A.  It's the same general process.  EnCase takes a word and

6    looks through the selected files for the word to find a

7    match.  It's just -- you know, it's able to do it much

8    faster than you would be able to do in --

9    Q.  I'm sorry.  I can't hear.

10   A.  EnCase is able to do it much faster than you would be

11   able to do it in, you know, like Windows Explorer or inside

12   of Microsoft Word.  But you can do the same task within

13   Windows, it's just much slower.

14            THE COURT:  If you're using Windows Explorer to

15   search for keywords in documents and you have documents

16   saved as PDFs on your computer, are those going to come up,

17   or just Word documents and Excel documents and other

18   Microsoft documents going to come up?

19            THE WITNESS:  You're a little hard to hear because

20   the translators must be very close to the phone.

21            THE COURT:  I'm sorry.  I just moved away from the

22   microphone.

23            If you do a word search on your computer for

24   documents, is it going to search documents saved as PDFs?

25            THE WITNESS:  You can do that.  It depends on how

1          you're using Windows Explorer to search.  You can search for

2          everything with a world or you can tell it just to search,

3          you know, for Word documents for this match.

4                    THE COURT:  Right.  But if I use -- just go on my

5          laptop or my desktop and search for a word, I'm going to

6          find all the times that word is in a Microsoft Word

7          document, right?

8                    THE WITNESS:  Yes.  It will show you.  If it finds

9          the word, it will show you the document.

10                   THE COURT:  And if they're in PowerPoints or Excel

11         spreadsheets, it's going to come up.  But if somebody sent

12         me a document as a PDF, as an attachment in e-mail, and I

13         saved it on my computer, or I just saved a document as a

14         PDF, unless I opened that document and search it, is a word

15         search from my computer, in general, going to search inside

16         PDFs for words?

17                   THE WITNESS:  Some PDFs are searchable and some

18         are not.  So, no, that's not always going to be guaranteed

19         to take place.

20                   MR. DEITCH:  Judge, I'm going to use the line you

21         used with me yesterday.  You ended where I want to begin.

22         BY MR. DEITCH:

23         Q.  There are some PDFs that have, am I correct, it's OCR,

24         optical character recognition?

25         A.  Correct.

1    Q.  And an OCR PDF document is one that you can search for

2    the words that are contained in the text of the document,

3    correct?

4    A.  Correct.

5    Q.  Does EnCase allow you to search -- to do any kind of

6    searching within PDFs that are not OCR?

7    A.  No.

8    Q.  All right.  And when EnCase searches for documents --

9    or, searches for keywords, I should say, does it search any

10   kind of metadata or other places on the computer that is

11   different from the kind of information that is searched by a

12   normal user on a laptop computer?

13   A.  Well, you asked for two different searches that would

14   take place in two different locations.  The metadata, like

15   in a Word document, is inside the Word document, so EnCase

16   would search that.

17   Q.  And is that different from if I search for it using the

18   functionality in Microsoft Word?

19   A.  Yes.  You would not -- you would not -- like a sub-word

20   would not find a word if it was inside the metadata, say,

21   like, the owner of the company or, you know, the last name

22   of the person that created the document.

23              MR. DEITCH:  Give me just a couple of moments,

24   Your Honor.

25              THE COURT:  Did you do anything to search text of

1    any PDFs?

2           THE WITNESS:  No.  I used EnCase to search the

3    PDFs, but just as they were on the computer.  I did not do

4    any type of PDF post-processing to make them more

5    searchable.  Just how ever -- whatever was searchable,

6    Encase was able to search, and PDFs that were not

7    searchable, EnCase was not able to search.

8           THE COURT:  But the ones that were searchable, how

9    would you do it, if you had, say, my computer and you didn't

10   have Encase?

11          THE WITNESS:  If they're searchable, then Windows

12   Explorer should be -- should find the same -- the same hits,

13   the same matches.

14          THE COURT:  Okay.

15          MR. DEITCH:  Okay.  You -- give me one moment,

16   Your Honor.  I may be finished.

17          Your Honor, that's all the questions I have for

18   Agent Marshall.

19          THE COURT:  Thank you.  Any redirect?

20          MR. YETTE:  Yes, Your Honor.

21                   REDIRECT EXAMINATION

22   BY MR. YETTE:

23   Q.  Agent Marshall, Mr. Deitch, the last lawyer, asked you

24   about Customs and Border Patrol policies and whether --

25   well, do you remember those questions?

1    A.   Yes.

2    Q.   All right.   And are you a Customs and Border Patrol

3    officer?

4    A.   No.

5    Q.   Now, did -- does HSI have their own policies and

6    procedures?

7    A.   Yes.

8    Q.   And did Agent Hamako, to your knowledge, when he seized

9    the laptop and then gave it to you, was he following HSI

10   procedures?

11   A.   Yes.

12   Q.   And does HSI or you, as a computer forensic examiner, do

13   you have different protocols for a border search of a

14   computer as opposed to another type of search?

15   A.   Yes, there are some that are different.

16   Q.   Can you explain that?

17   A.   For a border search it has to be done in a timely

18   manner, so they're given the highest priority.   They're

19   processed as soon as they come in and we try as quickly as

20   possible to get the laptop -- or, the computer copied so we

21   can return it to the owner, and then as quickly as possible

22   get the -- get the files to the case agent so they can

23   review them.

24   Q.   And is that why you don't do a fuller, more complete

25   forensic examination of the computer?

1    A.  Correct.

2    Q.  Now, I think I heard you kind of say that there's no one

3    standard definition for a forensic examination of a

4    computer, is that correct?

5    A.  That's correct.

6    Q.  So, kind of following the logic that the other lawyer

7    was using, if you are a computer forensic examiner and you

8    just turned on a computer which was in evidence, is that --

9    could that be considered a forensic examination?

10   A.  No.  If you're turning on the live computer, that's not

11   a computer forensic examination.

12   Q.  What would be the first step?

13   A.  The first step would be to remove the hard drive from

14   the computer, laptop, whatever it would be, and make a copy

15   of that, that hard drive.

16   Q.  Okay.  If you stopped right there and didn't do anything

17   else, would that be a forensic examination of some sort?

18   A.  No.

19   Q.  What else would you have to do?

20   A.  You would have to analyze the data that you just copied,

21   you know, to be able to start the exam.

22   Q.  So the exam has to consist of some analysis?

23   A.  Correct.

24   Q.  All right.  Examine or processing of the files on the

25   computer?

1    A.  Correct.

2    Q.  Now, you used the Intella and EnCase programs to process

3    the e-mails and other files, correct?

4    A.  Yes.

5    Q.  Is it fair to say that those software programs made the

6    examination of the computer more efficient?

7    A.  Yes.

8    Q.  However, if an agent is at the border and is searching

9    the computer, the same documents that you gave, for example,

10   to Agent Hamako, if he's at the border searching those same

11   documents, what would be the difference?  Would it just take

12   longer?

13   A.  It would just be the amount of time to find and view the

14   documents.

15   Q.  So, he could look at the same documents at the border

16   that you -- Agent Hamako could look at the same documents

17   that you gave him, if he were at the border?

18   A.  Yes.

19   Q.  It would just take a lot longer?

20   A.  Correct.

21            MR. YETTE:  Thank you, Your Honor.  That's all.

22            THE COURT:  All right.  Anything further?

23            MR. DEITCH:  Couple more questions, Your Honor.

24   Just a couple.

25            THE COURT:  All right.

```
 1                    RECROSS-EXAMINATION

 2    BY MR. DEITCH:

 3    Q.  Agent Marshall?

 4    A.  Yes.

 5    Q.  Agent Hamako could not have looked at those files on the

 6    border if he did not have the password for the laptop, correct?

 7    A.  Correct.

 8    Q.  And Agent Hamako could not look at the files at the

 9    border, even if he accessed with a password, if the files

10    did not have the same suffix as the ones that are defined by

11    the different programs, correct?

12    A.  Correct.

13    Q.  Thank you.

14              THE COURT:  All right.  Agent Marshall, we

15    appreciate your ability to make yourself available so

16    promptly and your participation in the hearing, but you're

17    now excused.  And we're going to accomplish that by hanging

18    up on you.

19              THE WITNESS:  Thank you.

20              THE COURT:  Thank you very much.

21              THE WITNESS:  Bye.

22              THE COURT:  All right, does the government have

23    any more witnesses to present?

24              MR. YETTE:  No, Your Honor.

25              THE COURT:  Is the defendant going to present any
```

1    witnesses in this hearing?

2              MR. DEITCH:  May I consult with Mr. Yette for just

3    a moment?

4              THE COURT:  Yes.

5              (Pause.)

6              MR. DEITCH:  No, Your Honor.  We have none.

7              THE COURT:  All right.  So we're at the point now

8    where I would like to hear from everybody, to talk about the

9    law and the facts in connection with this.  But I think this

10   also might be an opportune time to take a short break.  So

11   why don't we do that and come back at 2:15.  And I'll hear

12   from the defense first.  Thank you.

13             (Recess.)

14             THE COURT:  All right.  The way I see this right

15   now, and you can address all the issues in whatever order

16   you want to address the issues, but, we have a real decision

17   tree of issues and I keep looking for the easy one and I

18   don't think any of them are easy.  I guess the question that

19   we were just working through is whether this was a, quote,

20   unquote, routine border search and nothing more, or whether

21   this was the something more that at least some courts have

22   said requires more than the plenary authority that the

23   government has at the border; it requires a reasonable

24   suspicion.

25             So, if it's something more, then we have to decide

1    whether this is the circuit in which reasonable suspicion is

2    required.  But, if this search isn't the kind of search that

3    those courts said required it, then maybe we don't have to

4    reach that question.

5           If we do have to reach the legal question, then

6    not only do you have to reach the legal question and whether

7    or not reasonable suspicion is required, but then whether or

8    not on these facts there was reasonable suspicion.

9           Judge Contreras had a case where he didn't have to

10   reach the constitutional question whether reasonable

11   suspicion was required because he said he had it in any

12   event, so I don't need to reach it.  But if I find there

13   wasn't reasonable suspicion, then I have to answer the hard

14   question, unless it wasn't the kind of search that prompts

15   the hard question.

16          And then reasonable suspicion, to me the question

17   is reasonable suspicion of what?  I believe that reasonable

18   suspicion involves criminal activity in the present tense.

19   Afoot is different than occurred.

20          So the question is did this officer have even

21   reasonable suspicion, as low a threshold as that is, that

22   criminal activity was afoot at LAX the day he detained the

23   laptop.

24          So, I'm concerned about all of those issues.  And

25   I want to hear you on a lot of those issues.  I have

1     questions for both of you, but I will try my best to at

2     least hear what you have to say before I attack you with

3     questions, although I've been known not to live up to that.

4             And one question that you should both be thinking

5     about is whether, now that you have actually heard what the

6     evidence is, this is something where you want to brief how

7     those facts apply to this law.  Because I can tell you right

8     now, I'm not going to rule from the bench.  I'm taking this

9     under advisement.  Whatever I do in this case, I'm going to

10    have to write.  And so -- but the longer I give you to put

11    your thoughts on paper, which I think might be helpful,

12    there's -- there may be speedy trial implications with that.

13    I get another 30 days just for taking it under advisement.

14    But if I don't have the benefit of your thoughts at the

15    beginning of that, I'm not sure what the implications of

16    that are.

17            So, with all that said, why don't you start where

18    you want to start.

19            MR. DEITCH:  I will, Your Honor.  And I think I

20    will address, really, exactly the questions you've

21    identified; maybe in the order that you would do it, maybe

22    not, but they'll all be addressed.

23            THE COURT:  I don't even know what order I would

24    do it.  So go ahead.

25            MR. DEITCH:  I'll answer your last question first,

1   which is I don't believe further briefing is necessary.

2   Although I'm certainly willing to submit further briefs, if

3   the court directs us to do so.

4          THE COURT:  I don't think there's any more law out

5   there.  We've got the law and now I have the facts.  But,

6   all right.

7          MR. DEITCH:  I think that's right.  Your Honor, we

8   need to start with the premise, perhaps not recognized by

9   Agent Hamako entirely, that the Fourth Amendment applies at

10  the border.  The border is a place where the balance between

11  privacy and governmental law enforcement interests may be

12  different than it is in other places, but the Fourth

13  Amendment still applies and a border search is not a free

14  pass to invade the privacy of individuals without limitation.

15         The touchstone is, as it always is under the

16  Fourth Amendment, the question of whether the search is

17  reasonable.  And I ask that the court keep that in mind

18  because we talk a lot about routine, nonroutine searches and

19  we talk about the presence or absence of reasonable

20  suspicion.  But the overarching question that the court has

21  to answer is:  Was the search reasonable?

22         THE COURT:  The only thing that the Supreme Court

23  has even hinted would be unreasonable or highly extreme and

24  invasive, and so to the extent courts have found computer

25  examinations to be unreasonable, they are at the -- you

1    know, they use the terms computer strip search, they are at

2    the heavy-duty end of the spectrum.

3            So, the general principles were really -- it's a

4    very narrow window that the Supreme Court has left open at

5    the border.  And I understand your general point, but we

6    really need to talk about --

7            MR. DEITCH:  And I will.  I'm not trying to avoid

8    talking about it specifically, although I respectfully

9    differ with the court in one twist, which is I don't think

10   that it's narrow, what the Supreme Court has left open.  I

11   think the Supreme Court has addressed the truly extreme

12   cases of invasions of personal privacy, such as strip

13   searches, body cavity searches, destruction of vehicles,

14   things like that.  But I think it's left open, a very wide

15   range of invasions of personal privacy that could outweigh

16   governmental interests in a way that makes searches

17   unreasonable.

18           And the reason why I return and why I want the

19   court to keep in mind this overarching question of is the

20   search reasonable, is because that is the question that the

21   Supreme Court was seeking to answer in all of those cases.

22   And I think it is worth noting, and we did this in our

23   motion, that the Supreme Court has recognized that

24   electronic media now, in this age, and the containers that

25   we carry with us during international travel; phones, media

1    organizers or thumb drives or laptops contain enormous

2    amounts of personal information and are extremely -- and are

3    full of information that incorporate a lot of issues about

4    personal privacy.

5           And that's why I think that there is still plenty

6    of room for the Supreme Court to address this issue, if this

7    issue, as I expect it may one day, reach the Supreme Court

8    and they decide it.  But for now it's in front of this

9    court.

10          THE COURT:  Well, I mean, almost all the cases

11   that we're talking about about computer searches came down

12   before *Riley*.  So I am interested in how *Riley* changes the

13   calculus and the fact that the court did specifically seem

14   to recognize that you're carrying your whole life around on

15   a cell phone.  Clearly, if you're carrying your whole life

16   around on your cell phone, you're carrying your whole life

17   around on a laptop.  And the chief justice recognized that

18   the usual interests that underlie the breadth of authority

19   for a search incident to arrest don't necessarily underlie

20   the kind of analysis that you could get into if you search a

21   cell phone.

22          So, I think there's threads to be drawn there that

23   help the defense.  But, you also have the very strong

24   language about the breadth of the authority at the border

25   and the control -- concerns about national security.  I

1    mean, a lot of the border language is about what's coming in

2    and doesn't have anything to do with this case.  But, I

3    don't think there's any dispute that there's case law that

4    supports the notion that what's going out, and particularly

5    export controls that have a national security underpinning,

6    that the same case law applies.

7          So, if there's anything you think the Supreme

8    Court has said specifically in *Riley* that I should look at --

9    and I haven't looked at the *Jones* case, the GPS case, yet to

10   see if there's anything in there that might be useful here.

11   That will be -- because there isn't anything the D.C.

12   Circuit said.  So if there's anything the Supreme Court has

13   said, that would be good to know.

14         MR. DEITCH:  I don't want to overstate what I

15   think the import of *Riley* is for this case.  I'm not

16   suggesting, for example, that a search of electronic media

17   per se is unreasonable or per se requires some level of

18   suspicion.  I only mention the case to note that the Supreme

19   Court has recognized the privacy interests implicit in the

20   information we carry in our electronic items.  That's really

21   the limit of what I'm suggesting.

22         But the balance tips in favor of the government at

23   the boarder to do routine searches because of the types of

24   interests that are being protected.  And Your Honor just

25   referenced this issue.  On an incoming search we are largely

1   talking about safety issues; weapons, contraband, things

2   that are being brought into the country.  On outgoing

3   searches there are interests, but they're really not exactly

4   the same interests.  Of course, getting on an airplane,

5   they're concerned about safety issues for passengers and for

6   aircrew and so forth.  But, most of the cases that talk

7   about outgoing border searches are talking about things like

8   bulk currency smuggling or contraband like child pornography

9   or export controls.

10          And, Your Honor, you have really put your finger

11   on the issue, though, that the question is about reasonable

12   suspicion, assuming that it is required, really has to do

13   with the question of what was happening during that outgoing

14   search.  Because in order for the government's interests in

15   controlling what is carried out of the country to be

16   important, the search has to be somehow related and coupled

17   with that interest.  If the government is going to say that

18   it has this broad border search authority, it must have that

19   broad authority because the search is serving some relevant

20   interest.  And when the search becomes completely uncoupled

21   from those interests, I suggest to the court that the

22   balance of --

23          INTERPRETER SIMMONS:  I'm sorry.  The interpreter

24   pushed the wrong button.

25          THE COURT:  Are we back?  Are we okay?  All right.

1          MR. DEITCH:  When the search becomes completely

2     uncoupled -- I'm sorry.

3          INTERPRETER PARK:  Your Honor, may the interpreter

4     address the court?  Could we have the counsel slow down a

5     little?

6          MR. DEITCH:  I will.  I apologize.

7          THE COURT:  I tried to get him to do that

8     yesterday.  Yes, it's hard.  Thank you.  We will try.  And

9     let us know if we don't succeed and we'll try harder.

10          MR. DEITCH:  When the search becomes completely

11     uncoupled from the governmental interests that justify it,

12     the balance of what constitutes a reasonable search under

13     the Fourth Amendment changes.  And that is really the core

14     inquiry that the court must make in resolving this motion.

15     Because in this case Agent Hamako had decided that he was

16     going to seize and search Mr. Kim's laptop to obtain

17     evidence of a past crime.  And that is completely uncoupled

18     from any interests that the government has in conducting

19     outgoing border searches.  And the scope and the duration

20     and the manner of the search far exceeded what any customs

21     officer could have done at the border in what has been

22     called, in the case law, a routine search.

23          And I suggest to the court that there was no

24     reasonable suspicion.  And I'm going to address all of these

25     issues.  And that because it was a nonroutine search,

1    completely uncoupled from the government's outgoing border

2    search interests, and because there was no reasonable

3    suspicion, you should suppress the evidence.

4              THE COURT:  What do you do with the case law that

5    says the intent of the agent was irrelevant?

6              MR. DEITCH:  The --

7              THE COURT:  Because I -- you put your finger on

8    exactly what I think the issue is in this case and what has

9    troubled me about this case.  So, there is case law there

10   that says that.  So what do you do with that?

11             MR. DEITCH:  Well, if you view Agent Hamako -- if

12   you view the fact that Agent Hamako was searching for these

13   2007, 2008 e-mails as an issue with his intent, I agree,

14   Your Honor, that doesn't help us, because the case law, I do

15   believe, unfortunately, is fairly clear, that pretext, if it

16   exists, is not a basis for suppression.  Although it may be

17   a factor that might come into play in some way, but per se

18   it is not a basis for suppression.

19             But I suggest to the court that those facts are

20   not simply an issue of intent, they are an issue of the

21   scope of the search.  And viewed as part of the scope of the

22   search, they are central to the inquiry.

23             And I'll return to that.

24             For lack of any better choice, I'm going to start

25   with the issue of reasonable suspicion because, candidly, I

1    think it's one that the court can dispose of fairly quickly.

2            As the court has noted, the issue is whether

3    criminal activity was afoot, to use the language of *Terry*

4    *versus Ohio*.  And when we prepared our motion we struggled

5    with this issue because the courts, in their opinions, are

6    really, really bad in the way they write in that they do not

7    make very clear reasonable suspicion of what.

8            But contextually, I believe that the court is

9    absolutely correct.  It must be reasonable suspicion that a

10   crime is being committed at the time that the search is

11   conducted, at the time that the person is crossing the

12   border.  And that's the only way to understand it that makes

13   sense.  It's the only way to understand it that makes sense

14   in terms of an analysis of why that is a reasonable search

15   at that time and in that place.

16           THE COURT:  Well, to me --

17           MR. DEITCH:  Otherwise it would vitiate the entire

18   Fourth Amendment.

19           THE COURT:  *Terry versus Ohio* plainly would not

20   let an agent from the Department of Justice who sees the

21   target of a white-collar criminal investigation walking down

22   the street with a laptop, stop them and search the laptop.

23   Because they have no reasonable suspicion that criminal

24   activity is afoot, but simply think that their evidence is

25   walking down the street.

1          So if this isn't a search for which reasonable

2     suspicion was required, it doesn't matter.  But if this is a

3     search for which reasonable suspicion is required, then --

4          MR. DEITCH:  Right.  And the courts, in their

5     language, are not clear that it is reasonable suspicion that

6     a crime is being committed at that time.  But, a number of

7     the courts do cite *Terry versus Ohio* and a number of them

8     actually quote the crime afoot language.  And I suggest to

9     you that that is sufficient -- a sufficient basis on which

10    you should proceed in the same way of assuming that that is

11    the focus of the reasonable suspicion inquiry.

12         So what did the government know at the time that

13    Mr. Kim was leaving the United States on December 5th, 2012?

14    They knew that Mr. Yang, with a motive to lie because he was

15    a cooperating defendant, seeking leniency or some mitigation

16    of his sentence, claimed in his 2012 debriefing that Mr. Kim

17    had assisted with a 2008 purchase of accelerometers.  There

18    is no corroboration whatsoever that the agents had at that

19    time.  And the only documentary evidence that the agents did

20    have in their possession were documents that corroborated

21    what they already knew about Mr. Kim; that for 30 years he

22    had worked as an exporter with a number of companies for

23    that purpose and that they had exported items that did not

24    require licenses, legally, relating to the petrochemical

25    industry.

1           They also knew that Mr. Yang -- oh, and they knew

2    that in that, that business of exporting petrochemical

3    related products, that Mr. Kim had done business with Mr.

4    Yang for a number of years.  They knew that in 2011, during

5    the undercover operation that HSI undertook at that time,

6    that Mr. Yang had e-mailed Mr. Kim to try to get him

7    involved with another purchase.  But they also knew that Mr.

8    Kim did not get involved with that purchase.  And there's

9    some suggestion that he -- that he responded at some point

10   to the e-mail, saying that the Honeywell company wanted

11   information about end users and didn't want to ship overseas

12   and that he wasn't going to get involved.

13           So all the government knew, in December 2012, was

14   that there was a single allegation by Mr. Yang that on a

15   single occasion Mr. Kim had shipped accelerometers out of

16   the country without a license.  And I know Your Honor caught

17   this because you asked some questions of the agent.

18   Shipped.  Not hand-carried, but shipped.  And in fact, the

19   agents also knew that in 2011, when Mr. Yang was talking to

20   them, that he specifically told them that he did not want

21   Mr. Kim to be hand-carrying products across the boarder

22   because he could get stopped and he could get in trouble.

23           And that, of course, is highly relevant because in

24   this case the -- there's no issue about shipping.  This

25   wasn't an interception of a package.  This has to do with

1      hand-carrying.

2              We also know that between the acquisition of this

3      information in 2011 and 2012, early 2012 and when Mr. Kim

4      was stopped, the government did nothing to corroborate this

5      information, other than gathering information from

6      databases.  They did no surveillance, they never attempted

7      to interview Mr. Kim, although he was in and out of the

8      country.  They never interviewed any of Mr. Kim's family who

9      is in the United States, or attempted to contact any of the

10     companies that were involved.  They did absolutely nothing,

11     so that there was no further information required.

12              So now we're up to December 5th.  Agent Hamako has

13     decided, as he said, before this point in time that he

14     intended to seize the laptop.  And I suggest to the court

15     that on that basis alone you can ignore all of the arguments

16     about the contents of Mr. Kim's luggage in terms of

17     reasonable suspicion because the agent had developed his

18     belief already.

19              But, I also suggest that what happened with the

20     luggage, it actually helps Mr. Kim in asserting that there

21     was no reasonable suspicion.  The products that were in the

22     suitcase, Your Honor, were perfectly consistent with Mr.

23     Kim's longstanding business as an exporter.  Unfortunately --

24     and I mean no disrespect to Agent Hamako, but it was very,

25     very sloppy police work.  We have no photographs of what was

1    in the suitcase, we have no photographs of how they were

2    packaged in the suitcase, we have a no information about

3    what the products were, where they were from, what

4    manufacturer they were from, what efforts he made, when he

5    made those efforts.  Nothing.

6         But what we do know is that at least two out of

7    the three things that he found he didn't even think they

8    were important.  And the only thing that he claims he

9    thought was pertinent--which was the term that he returned

10   to repeatedly--were these o-rings.  And I suggest, frankly,

11   to the court that the claim that he had a good faith basis

12   to believe that those o-rings might be used for jet fighters

13   is simply preposterous.

14        O-rings are a ubiquitous item with numerous --

15   numerous is probably too plain a word and too limited a

16   word, but numerous perfectly innocent uses.  And the idea

17   that a law enforcement agent who finds an item that is

18   perfectly innocent can use that as a basis for seizing a

19   laptop is an awfully harsh idea.  And I suggest to the court

20   that really, particularly given that he made no effort at

21   the time to determine what these o-rings were, that you

22   should find that there was nothing in the luggage that could

23   either give rise to or add to any suspicion that Agent

24   Hamako had.

25        And finally, I note what I mentioned earlier on,

1    which was simply that Agent Hamako testified very candidly

2    that he was searching for evidence of a past crime, although

3    he added, and any future crime, although there was no

4    evidence, no factual basis on which he believed that

5    anything was afoot.  What we had was one instance,

6    uncorroborated, that had occurred four years earlier and

7    nothing more.

8            And I suggest to the court that on those facts it

9    cannot possibly constitute reasonable suspicion.

10           THE COURT:  Well, I think the harder question for

11   the -- I mean, you can keep arguing about reasonable

12   suspicion, but I think I know your argument on reasonable

13   suspicion.  I'm more interested in your argument now on the

14   question of whether this is the kind of search for which

15   reasonable suspicion is required.

16           MR. DEITCH:  Um-hum.  That's where I was turning.

17           THE COURT:  And I know -- it's not your position,

18   I take it, that searching the contents of any laptop --

19   well, I don't know what your position is.  Where is the

20   line?  Is it searching a laptop at all?  Is it something

21   beyond routine?  Am I supposed to adopt the test out of the

22   District Court of Maryland?  *Cotterman* says it's a forensic

23   search.  Was this a forensic search?  What's the difference

24   between the two formulations?  This seems to be something in

25   between all of them.

1          MR. DEITCH:  I'll address all of that.

2          THE COURT:  All right.

3          MR. DEITCH:  Or I'll try to anyway.

4          THE COURT:  All right.

5          MR. DEITCH:  But let me put one thought out there

6     first and then I'm going to turn specifically to those

7     issues, which is, this search, as I mentioned, was

8     completely uncoupled from the purpose for which the

9     government has border search authority.  Outgoing border

10    search authority exists for the purpose of controlling what

11    passengers are carrying out of the country.  And I suggest

12    that the court could find that the balance of what is

13    reasonable tips --

14          THE COURT:  Well, you made that point and I

15    thought that was interesting.

16          MR. DEITCH:  But now I'll turn to the issue of

17    routine analogy.

18          THE COURT:  But I got that one down.

19          MR. DEITCH:  Your Honor, the issue of whether a

20    search is routine or nonroutine, to use the language that

21    most of the cases use, is large a question of the scope,

22    manner, and duration of the search.  And let me read some

23    language to you from the *Saboonchi* case, S-A-B-O-O-N-C-H-I.

24          THE COURT:  Well, one of the things he said that

25    makes it different is time.

1          MR. DEITCH:  Yes.  And I think that's a critical

2    issue here, but not the only issue.  What the judge said in

3    *Saboonchi* -- and, you know what, Your Honor, rather than

4    read it, I'm going to capture it in a phrase:  What can a

5    customs officer do while the passenger is standing there

6    waiting to get on his or her plane?  And I think that's an

7    important point.  Border searches are supposed to be

8    something that happens quickly.  They're supposed to be

9    something that allows a passenger, under normal

10   circumstances, to continue outbound without delay and with

11   his or her possessions.

12          And there is a lot of discussion about, you know,

13   is it like searching a piece of luggage?  And I don't know

14   that that's the best comparison, but --

15          THE COURT:  If I can write this opinion without

16   metaphors, I'm going to try to do that because I find all of

17   them --

18          MR. DEITCH:  They're terrible.

19          THE COURT:  -- ill-fitting.

20          MR. DEITCH:  Judge Bork -- in the *Saboonchi* case

21   they quote Judge Bork in either a book or an article, I

22   don't recall which, saying that comparing a laptop or an

23   electronic media device to a suitcase is like comparing a

24   glass of water to an Olympic swimming pool because both are

25   containers that contain water.  And, of course, it's a very

1    poor comparison.

2           But I think the idea of thinking in those terms of

3    was this the kind of search that a customs officer could

4    perform standing there at the border is an important one.

5    Both -- not just in terms of the duration of the search,

6    although that's significant, but in terms of the scope and

7    the manner of the search.

8           I think that the use of the term forensic

9    examination is counterproductive.  What I tried to -- what I

10   tried to bring out during Agent Marshall's testimony is it's

11   a very ambiguous term that captures a broad range of

12   activities.  And I think some of those activities are called

13   forensic searches to justify the salaries of the people who

14   perform them, and some of them truly do involve extremely

15   detailed and highly intrusive examinations of computer data,

16   and that there's a wide spectrum in between.

17          I think a more useful question is was the person

18   who examined -- who did the search of the substance in the

19   computer, the data in the computer, was that -- did that

20   person conduct the search in a manner akin to what he or she

21   could have done as a customs officer standing there on the

22   jetway or at a table in the security area as the passenger

23   passed through?

24          I'll remind you, for example, Your Honor, in

25   both -- I believe both the *Cotterman* case and the *Stewart*

1   case, which is a Sixth Circuit case, the person came up, the

2   customs officer had them open their laptop and turn it on --

3   and perhaps that's happened to you as you've gone security.

4   I know it's happened to me, as well.  I know some of it,

5   they want to know that it's actually a computer.  But when

6   they opened it -- I believe it was *Cotterman*, they saw

7   folders that led them to believe that they were photographs.

8   And they knew a little something about Mr. Cotterman and

9   believed, I think mistakenly, but believed that he had a

10  prior conviction for child pornography.  And I think the

11  folder said something like Kodak memories or something that

12  suggested it was photographs.

13          They clicked on the single folder and looked at a

14  couple of pages of photographs and saw photographs of -- I

15  believe it was nude underage children.  And on that basis,

16  the court found, among other things, that there was

17  reasonable suspicion.

18          But it was an escalation of information based on a

19  search of the computer by the customs officer that was done.

20  And you can call it a quick look or a manual search, but the

21  concept, without getting too caught up in the terms, is

22  something that a customs officer can do standing there.  And

23  it goes back --

24          THE COURT:  Well, putting aside the terms -- and I

25  understand you're saying reasonableness and unreasonableness

1    may change, depending on whether this is really looking for

2    something that's happening right then and there or whether

3    this is a search for evidence.  But, where have we left the

4    jetway?  When we make the copy?  When we apply programs to

5    search the copy?  When we search it at all?  What is the

6    point where it stopped being what you could do at the time?

7          The government is looking at this from a results-

8    oriented perspective.  Notwithstanding everything they did,

9    didn't they seize something that somebody standing there

10   could have seen, if they powered it up and they searched it?

11   And I take your point that had there been a password, they

12   could have been stymied from the get-go.

13         But, let's say he was willing to give them the

14   password -- I mean, he handed over the laptop without a

15   fight, let's say he handed over the password without a

16   fight, and eventually they could have seen what they saw, is

17   there something -- where in the process did we cross the

18   line?

19         MR. DEITCH:  I suggest to the court, at first,

20   when they seized the laptop and kept it for several days and

21   made a copy, that alone is sufficient -- is a sufficient

22   depravation that it is no longer routine, because of the

23   duration involved.

24         In this case that's not all you have, obviously,

25   and I -- if that were all that you had, I could understand,

1    perhaps, the court not accepting that argument.  But here

2    you have a significantly longer depravation.  You also have

3    a search that is done by tools that do things that Agent

4    Hamako could not have done on the jetway.

5          You heard me elicit from Agent Marshall testimony

6    that EnCase can identify files that a user would not

7    recognize as content files, such as World files; that Encase

8    is able to organize in a different way, that EnCase -- that

9    the Intella program indexed the e-mails in a way that you

10   couldn't do, which has to do both with the content of the

11   search, but also the speed of the search that is possible.

12   And that's a very important issue because -- because what

13   you had here were some 47,000 non-e-mail content files.  And

14   I will proffer to the court that what the government has

15   provided to us is some 50,000 e-mails that were on the

16   laptop.

17         And Agent Hamako's testimony was when he was asked

18   could I -- and I'm paraphrasing, but could I have looked at

19   it?  He said yes, if I had infinite time.

20         THE COURT:  Which he didn't.

21         MR. DEITCH:  And he would need something close to

22   infinite time to look at 50,000 e-mails.

23         THE COURT:  Let's assume that the seizing and the

24   copying, before any programs were added, the agents gave

25   themselves the luxury of something they do not have on the

1   jetway, which is time.  So, that's a significant factor.

2   But, if you go back to the few cases that have exceptions

3   for border searches, there's an element of intrusiveness,

4   real privacy invasion that, you know, some of the courts

5   seem to see in digging into encryption and in digging into

6   unallocated space and deleted files and metadata.  And so is

7   simply facilitating and expediting searching enough?

8           MR. DEITCH:  I believe it is, Your Honor.  And let

9   me explain why.  If we -- if the law were to divide the

10  world into permissible searches and forensic searches that

11  involve every bit and bite in the computer, including

12  unallocated space, I think that's a false division.

13  Because, for example, it is true that to do a rectal search

14  or a body cavity search is too much of an invasion of

15  privacy, but it's not the only invasion of privacy that is

16  not permitted.

17          A strip search that does not involve a body cavity

18  search is also an invasion of privacy.  Not as extreme, but

19  still crosses the line and tips the balance away from the

20  government's border search authority.  And I think the same

21  analysis applies here; a full-fledged, full-on forensic

22  analysis of a computer is too much.  It's a nonroutine

23  search that goes too far because it invades unallocated

24  space, deleted files, etcetera.

25          But that doesn't mean it's the only instance in

1    which the balance tips away from the government.  I suggest

2    to the court that depravation of the -- or, a seizure of the

3    information for a prolonged period of time and the use of

4    tools that would not otherwise have been available to the

5    agent and the searching for many, many days of the content

6    of the computer are also an invasion of privacy that tips

7    the balance.

8           It may be if you did it graphically, it would not

9    tip it as far, but it tips it far enough that it is away

10   from the government's interests.  It outweighs whatever

11   interests the government had in its outgoing border search,

12   certainly in this case.  And, of course, Your Honor, as a

13   general matter, the question is not just in general a matter

14   of general application, What should the rule be? but under

15   the facts of this case, did the government have interests

16   that outweighed the defendant's privacy interests?

17          So that I suggest that you -- I hope that the

18   court will not make the false distinction of a binary world

19   in which it's either a forensic examination that involves

20   everything or it's permissible.  Because I believe that it's

21   far more nuanced and it is a spectrum of invasions of

22   interests that are dependent on the particular facts of each

23   case.

24          So for those reasons, Your Honor, I believe that

25   this search went beyond what is a routine search.  This is

```
 1       not simply a customs officer conducting a border search.

 2              And, you know, I mentioned the issue of being

 3       uncoupled.  And in some ways that is -- it's really a

 4       separate argument and I do hope that the court will consider

 5       that.  Because while I don't claim any legal precedent that

 6       I'm aware of, I think it fits squarely within the notion of

 7       balancing privacy rights against governmental interests in

 8       determining whether a search is reasonable.

 9              And I think for either of those reasons, the court

10       should suppress the evidence.  And I'm happy to answer any

11       other questions that the court has.

12              THE COURT:  I think I've stuck them in as we went.

13       But -- let me see if I have any specifically for you that

14       you haven't touched on.

15              Well, just in general, what's your response to the

16       broad language in the Fourth Circuit opinion in Ickes?  I

17       mean, I believe there were things that triggered -- again,

18       there were facts, the escalation that you talked about that

19       led them to go further because of what they found at the

20       cursory level.  But the language is quite broad about

21       computer searches not being distinct from border searches.

22       Are they just wrong or is it that the facts here are

23       distinguishable?

24              MR. DEITCH:  I think my reading of Ickes, and many

25       of the other cases, is that the issue they were addressing
```

1    in those sort of first-generation laptop search cases, I

2    think the defendants were arguing that any search of a

3    laptop was somehow too much of an invasion of privacy.  And

4    I don't make that argument here.  I don't think the law

5    supports it anymore and I think *Ickes* is one of many cases

6    that says it.

7            But, I think in some ways that's all *Ickes* says in

8    that regard, is that laptop searches are not per se

9    unreasonable, but the scope, manner, and duration of the

10   search may make them unreasonable, as they did in this case.

11           THE COURT:  I mean, I think he's going to get up

12   here and make his own argument, but I think the government's

13   own argument is the scope of this one wasn't particularly

14   unreasonable.  They just searched documents by keywords,

15   e-mails by keywords, didn't look for anything he had ever

16   done ever about anything.  So, what's your response to that

17   anticipated line of argument?

18           MR. DEITCH:  But they did.  Let me -- hold on one

19   second.

20           THE COURT:  I mean, I'm trying to find where you

21   cross the line between saying I'm not saying any search of a

22   laptop, if you take it away and copy it, it is unreasonable,

23   but I'm saying that this one is.

24           MR. DEITCH:  Let me give you an example of what I

25   think would have been a very restrained search.  They knew,

1    or believed they knew from Mr. Yang that a transaction had

2    occurred in 2007 and 2008.  If they had gotten on his

3    computer and looked at e-mails in 2007 and 2008, that would

4    have been a very restrained, very limited search and then

5    Mr. Yette could be standing up here and saying, Judge, this

6    was not a search of everything in the computer.  This was a

7    highly focused search.  And I think there are --

8          THE COURT:  But that would have been exactly the

9    thing you would have said was improper because it was only a

10   search for evidence of a past crime.

11         MR. DEITCH:  That's because this whole search, I

12   think, was, frankly, wrong-headed to be begin with.  But

13   that's a separate issue.  My point is really that they could

14   have done a focus search, but they didn't.  They took every

15   single content file in that computer, of every type; Excel

16   files, Word files, WordPerfect files, JPG -- 25,000 JPG

17   images.  I'm leaving at least one out.  But there were every

18   content file -- type of content file that I can think of,

19   just about, and they took them all off the computer and they

20   searched them.

21         So it's not that they did a very focused search

22   just on one issue, they searched everything.  He spent nine

23   days reviewing these files, according to his own reports.

24         THE COURT:  One thing that's been interesting is

25   both you and -- both counsel have been referring not just to

1    Agent Hamako's report, but to the forensic agent's report.

2    If someone is interested in marking that as an exhibit for

3    me, since you've all been talking about it, throwing numbers

4    around from it, I would ask you to consider that.  Because

5    it would certainly be nice to have the same piece of paper

6    that you're all looking at when you talk to me.

7              MR. DEITCH:  I think we all tried to elicit

8    testimony, but I'm happy to offer it as an exhibit.

9              THE COURT:  I think it would be helpful to me.

10             (Off-the-record discussion between counsel.)

11             MR. YETTE:  Your Honor, I was thinking about it,

12   but did not.  I've already marked it as Government Exhibit 5.

13             THE COURT:  All right.  It will be received

14   without objection.  Helpful for me later.

15             MR. DEITCH:  So that's at least one way in which

16   this was not a very limited search.  It was a search of

17   every user content file on the computer.

18             The other way that it was not limited is the

19   keywords.  They could have used very limited keywords that

20   were looking for things.  But if you look at the keywords,

21   they include Grumman, they include Northrop, they include

22   Endevco.  Now, these are all companies that I am sure make

23   products that have military purposes and are sensitive.  But

24   they were looking for anything about export controls, not

25   simply these issues.

1              So while I understand Your Honor's point that they

2       had to somehow be looking if there was anything presently

3       happening.  I suggest, also, that there was no evidence that

4       there was a Northrop product in his suitcase or a Grumman

5       product in his pocket or anything like that.

6              But if you look at the keywords, they were

7       extremely broad.  They were certainly limited to issues

8       about export control, but extremely broad.  I mean, the last

9       one was nuclear.  Maybe accelerometers can be used in

10      missiles that are armed with nuclear weapons, but these are

11      extremely broad searches.

12             So I suggest to the court that the search was

13      broad.  The more relevant part really is, though, the fact

14      that every content file on that computer was sucked out of

15      it and given to Agent Hamako for extensive and prolonged

16      review.

17             THE COURT:  All right.  Thank you.

18             Mr. Yette.

19             MR. YETTE:  Thank you, Your Honor.  Your Honor, we

20      must start with the proposition that this was a border

21      search and the authority to conduct a border search is

22      broad.  And I know there wasn't a lot of discussion about

23      that.  We did include that in our brief and that is a

24      holding we think the court can find, if it's necessary.

25             This was proper.  The laptop was a container.

1    This was property; this was not a person.  The search of the

2    laptop was not so intrusive or invasive.  It did not destroy

3    the laptop.  And the case law is clear that at the

4    international border the same rules don't apply as within

5    the interior of our country.

6         There was an interest in this case in ensuring

7    that the defendant was not exporting information or objects

8    that needed a license to be exported.  And the search of the

9    laptop under those circumstances was more than reasonable.

10   So, you know, just starting with that, this was an

11   international boarder search; the government has broad

12   authority to conduct such searches.

13        THE COURT:  Were there any limits on a border

14   search of a computer?  If you're at the border, is any

15   search of a computer routine?

16        MR. YETTE:  I would have to say that -- yes.  That

17   is the international -- that is the position at the

18   international border, that the government can conduct a

19   border search of a laptop.

20        THE COURT:  Okay.  My question was -- wait.  I

21   want to make sure we understand each other.  I said are

22   there any limits to a routine border search?  I think I

23   asked several questions in a string.  And you said the

24   answer to your question is yes and some --

25        MR. YETTE:  There are -- there are limits to

1    border searches.

2              THE COURT:  Okay.  Are there limits to what you

3    can do to a computer, where it stops being a border search

4    for which no suspicion is required?

5              MR. YETTE:  There may be, Your Honor.  I'm not

6    going to say that there are definitely no such limits, but I

7    think the limits have been described in other cases where

8    it's so invasive or outrageous or destructive.  And that --

9    that was not the case here.

10             THE COURT:  So without taking a position on where

11   exactly the limits are, this didn't cross them?

12             MR. YETTE:  Yes.  I mean, there may -- right.

13   I'll leave it at that.

14             THE COURT:  All right.

15             MR. YETTE:  We would also argue that there was

16   more than reasonable suspicion in this case to conduct the

17   search.  First, we're talking about an HSI agent who was

18   conducting an ongoing investigation into whether Mr. Kim is

19   committing criminal activity.

20             This is not a customs border officer who is

21   standing at the border, does not conduct long-term

22   investigations, and just checks computers as people go by;

23   opens them up, maybe changes the evidence, evidentiary value

24   if he eventually finds something.  This is an ongoing

25   investigation.

1          THE COURT:  Which way does that cut?

2          MR. YETTE:  Well, according to Agent Hamako's

3    testimony, it cuts in favor of there being reasonable

4    suspicion because, on the one hand, he believed he did not

5    require reasonable suspicion because he had the border

6    authority to do the search.  But on the other hand, he told

7    you he doesn't just routinely go to the border and conduct

8    searches.  There has to be a reason for him to do that, and

9    there were reasons in this case.

10          He had conducted the investigation of Mr. Yang.

11    Mr. Kim came up in that investigation.  His identity was

12    uncovered in that investigation.  And the suggestion was, at

13    that time, that Mr. Kim may be involved in the illegal

14    export of accelerometers or other goods in 2011 when the

15    Yang investigation was going on.  But Agent Hamako told you

16    just because he's dealing with one person does not mean that

17    he's not working with other people to export accelerometers

18    or some other products.

19          And while -- in thinking about it, the list of

20    keywords that he prepared suggests that, that he was

21    thinking of ongoing activity because those companies,

22    Northrop, Grumman, Endevco and others, produce similar

23    products that must be licensed before they're exported.  And

24    it suggests to you that Agent Hamako was concerned, not just

25    with what Mr. Yang told him about the 2008 deal,

1     transaction, but of other transactions Mr. Kim could have

2     been involved with.

3              THE COURT:  Well, there's lots of reasons to

4     believe that that was possible.  What is the particularized

5     objective basis for suspicion that it was ongoing?

6              MR. YETTE:  If -- well --

7              THE COURT:  Isn't that what reasonable suspicion

8     is?  Is that a fair definition, a reasonable suspicion?

9              MR. YETTE:  Certainly in the *Terry* case it is.

10    And I'm not --

11             THE COURT:  And that's even what the -- the border

12    search cases that talk about computers and reasonable

13    suspicion, when they define it, that's the language they

14    use.  "Reasonable suspicion is defined as having a

15    particularized and objective basis for suspecting the

16    particular person stopped of criminal activity."  That's

17    *Cotterman*.  And in the case out of the District Court here,

18    Judge Contreras's case, he said, "Reasonable suspicion

19    exists when a law enforcement officer has specific and

20    articulable facts which, when considered together with

21    rational inferences from those facts, indicate that criminal

22    activity may be afoot."

23             I mean, what the agent said is sometimes people

24    who deal with one person deal with more than one person.

25    And you're saying he looked for companies other than

1    Honeywell.  And that defines the scope of a reasonable

2    fishing expedition, but --

3              MR. YETTE:  I would analogize it this way:  Here

4    we have a person -- I think in the *Cotterman* case

5    somebody -- the agents knew he had been convicted previously

6    of possessing child porn or some kind of offense.  His prior

7    criminal activity suggested to them that there may be

8    ongoing criminal activity because he was in possession of a

9    computer, and so they wanted to search that.

10             If you analogize it this way to Mr. Kim, here

11   Agent Hamako had information that Mr. Kim participated in a

12   crime earlier and, therefore, once you suspect somebody of

13   having done a crime in the past, it's common sense to think

14   that if there are certain indicators, he still -- or, could

15   be committing that same crime.

16             THE COURT:  Well, doesn't the case law say that

17   reasonable suspicion can't be based an a prior criminal act

18   alone?

19             MR. YETTE:  Alone.

20             THE COURT:  So where's the plus factor?

21             MR YETTE:  The plus factor, not only what Mr. Yang

22   told the officer, but --

23             THE COURT:  That is the criminal -- prior criminal

24   act.  That's all they got on the prior criminal act.  So

25   what do they have in addition to that?

1           MR. YETTE:  Well, if we just go to the day the

2    search occurred at the airport, I disagree with Mr. Deitch

3    that you have to ignore or should ignore the agent's

4    discovery of the o-rings.  I think you must consider it

5    because it's part of the totality of the circumstance.  And

6    if you consider that, in addition --

7           THE COURT:  Well, what do I know about the o-rings?

8           MR. YETTE:  What you know about it is what Agent

9    Hamako testified to, is that he found the o-rings in the

10   luggage.  O-rings can be used in numerous applications, but

11   that does not mean all applications are innocent or

12   innocuous applications.  He told you he knew that there are

13   certain o-rings on the munitions list that are used in F-4

14   fighters or other kinds of airplanes, and when he looked at

15   the o-rings, he did not know.

16          THE COURT:  What if he found a bag of screws or

17   nails?  Is there really any difference?

18          MR. YETTE:  If he knew that there are

19   particularized screws that are on the munitions list --

20   we're not talking about just a tie that I'm wearing that he

21   found because he knows a tie is not on the munitions list.

22   But, if he knows that a particular type of microphone has

23   capabilities that the government deems --

24          THE COURT:  Is there any plastic o-ring on the

25   munitions list?

1          MR. YETTE:  I haven't seen it, but the testimony

2    of Agent Hamako was he knew there are o-rings.

3          THE COURT:  That wasn't my question.

4          MR. YETTE:  I don't know.  I haven't looked at the

5    munitions list for o-rings.

6          THE COURT:  But he had.

7          MR. YETTE:  Yes.  And he said he knew --

8          THE COURT:  That some o-rings.  But -- so do we

9    have any indication?  I mean, I'm just -- I realize that he

10   didn't have sufficient clarity to say I can just let these

11   go.  I need to nail it down for sure.  He's thorough, he's

12   careful.  But, that's different from looking at something

13   and saying I actually have a reasonable suspicion that these

14   could be on the list.

15         MR. YETTE:  Well, when you couple that with I know

16   he has already committed a crime, according to Mr. Yang, and

17   I heard his name come up in 2011 in association with

18   another, similar crime, and I know also -- you know, Mr.

19   Yang's statements that the criminal activity took place

20   earlier is corroborated, was corroborated and supported by

21   the facts that the agent was able to confirm; that Mr. Kim

22   did actually travel to the U.S. when Mr. Yang said he would

23   travel and would be able to look at the accelerometers for

24   him, that -- I had -- there were -- the phone calls that

25   mentioned him and -- you know, between the UC and Mr. Yang,

1    and the business relationship itself, the fact that they did

2    have a longstanding business relationship supports Mr.

3    Yang's statement that he -- that Mr. Kim would assist him in

4    committing the criminal activity.

5            So the fact that he had pled guilty and was

6    wanting to assist himself does not mean that his information

7    should be ignored.  It was not ignored.  And it supports the

8    reasonable suspicion calculus.

9            So, we believe if you look at that day and the

10   o-rings and the past activity, if you consider the fact that

11   Mr. Kim --

12           THE COURT:  Well, should I look at that day when

13   the officer told me, in no uncertain terms, he decided to

14   seize his laptop the next time he came to the United States

15   and the o-rings didn't factor in?

16           MR. YETTE:  Yes, I think you have to consider it,

17   even if the agent did not.  You're the court making the

18   decision, looking at the totality of the circumstances prior

19   to the search.  And so you must consider those -- that

20   circumstance.  The fact that Agent Hamako believed that he

21   had sufficient suspicion prior to finding the o-rings only

22   supports the calculus here.

23           In addition to what we've talked about, he knew

24   that Mr. Kim was in the business of exporting goods and

25   could do as Mr. Yang said, ship items out of the country,

1    perhaps undetected.  And I want to be clear, the SED that we

2    mentioned, that supports this criminal case, is not part of

3    the calculus for reasonable suspicion.  We never argued that

4    and don't suggest that.  It only points out that when Mr. --

5    when Agent Hamako knew that there were numerous exports from

6    Karham Engineering and Apex, he knew that they didn't have

7    to be accurate, that things could have been exported in

8    violation of the law, despite what those SEDs said.  And

9    that's part of the calculus, as well, for reasonable suspicion.

10           So, I think the court can find that there was

11   reasonable suspicion in this case that supported the border

12   search.  And the search itself of the computer was not an

13   outrageous one.  Mr. Deitch suggests that the only type of

14   routine search that can be --

15           THE COURT:  So now you've moved on.  You talked

16   about reasonable suspicion, that if you need it, you had it.

17   But I take it your position is that you didn't need it?

18           MR. YETTE:  Did not.

19           THE COURT:  And so now you're telling me why not.

20   I just want to make sure I know where we are in our argument

21   because it's complicated.  So that's what you want to turn

22   to now.

23           MR. YETTE:  Right.  And there are other reasons

24   for reasonable suspicion that I think I said in the brief.

25           THE COURT:  What you said in the brief--and this

1    is what bothered me about reasonable suspicion--was, on page

2    12, "Yang's admission that he previously conspired with Kim

3    created reasonable suspicion that Kim had been and perhaps

4    still was involved in illegal activity."

5              And on page 14 you said there was a reason to

6    suspect the laptop contained -- still contained evidence of

7    the earlier criminal conspiracy, as well as, quote, "any"

8    recent ones.  And the "perhaps" and the "any" seemed, to me,

9    to be not enough to get you over the hurdle of prior

10   criminal conduct not being enough.

11             So, you've detailed today what you think the plus

12   factors are.  But if you think there's any more, you should

13   tell me right now what you think they are.

14             MR. YETTE:  If I come back -- Your Honor --

15             THE COURT:  I mean, you said the o-rings, his name

16   came up with the more recent incident, he did travel when

17   Yang said he would be traveling, and the business relationship

18   itself.

19             MR. YETTE:  And the ability to export.

20             THE COURT:  Okay.  All right.  Now, well, why

21   didn't I need -- why don't we need reasonable suspicion

22   anyway?  Because it wasn't outrageous.  You were headed down

23   that road when I asked you a question.

24             MR. YETTE:  Well, the search of the computer, you

25   know, I guess the case law talks in terms of routine and

1    nonroutine.  Here the search of the computer -- first of

2    all, we have HSI policy which says don't turn on a computer

3    in the jetway and try to search it because it presents all

4    kinds of evidentiary questions or problems.  This is not a,

5    like I said, a border patrol agent just looking for child

6    porn and may randomly find it, if he's lucky.  This was a

7    search where the agent followed his policy, his agency's

8    policy of taking the computer to a forensic examiner.

9           The examination itself, according to Agent

10   Marshall, was one that he tries to do quickly in accordance

11   with their border search policy, where he only obtained

12   limited information from -- even though there are vast

13   amounts, it's only from the allocated spaces and it's

14   equivalent to what the agent could have looked at if he did

15   have the luxury of spending days or weeks or hours trolling

16   through Mr. Kim's computer on the jetway.

17          THE COURT:  Isn't the fact that they did what you

18   couldn't do, because you don't have unlimited time in the

19   jetway, what makes this not a routine border search, it

20   makes it something else?

21          MR. YETTE:  Well, I think maybe we need to look --

22   technology has increased these days.  The -- I don't think

23   it's a nonroutine search when they're using search tools

24   that make a search more efficient.

25          And, you know, maybe we need to get away from

1    these definitions of nonroutine and routine and look at

2    what's reasonable, which is the Fourth Amendment language.

3    And the question is whether obtaining a laptop and doing a

4    reasonable search for information of past, ongoing, and

5    perhaps future transactions that violate the export laws, is

6    that unreasonable, when you have a person you know has

7    already done a deal, has come up in an investigation of

8    illegal exports of accelerometers and who's in possession of

9    o-rings and knows how to export items?  Is that unreasonable

10   to look at his computer for those items?  And I think the

11   answer is no.

12            THE COURT:  Tell me what they were looking for

13   again.  Evidence of past, present, and future, is that what

14   you just said?

15            MR. YETTE:  That's what Agent Hamako testified to,

16   the past criminal transaction with Mr. Yang.  But, really, I

17   thinking Agent Hamako's testimony made it clear he was

18   concerned about the present, whether Mr. Kim was in fact

19   continuing to engage in criminal activity on his return trip

20   to this country.

21            And, you know, Mr. Deitch argues that they -- that

22   the agents could have done all kinds of things you might see

23   in CSI.  But this is real life.  So, the agent did not have

24   the luxury of time to call -- find out the manufacturer,

25   make phone calls that take hours while he's at the airport

1    and before he's trying to get to Mr. Kim to do his border

2    search.  That's not practical.

3             THE COURT:  He would have taken the laptop no

4    matter what.  If he had found that the o-rings were in -- if

5    the bag had printed on it "innocent o-rings" --

6             MR. YETTE:  I agree.  He testified to that.  Yes,

7    he did.  And that's because he believed he had reasonable

8    suspicion before he found the o-rings.  And as I said, you,

9    as the court, must consider the totality of the

10   circumstances and not simply what Agent Hamako believed

11   based on his testimony.  The o-rings do factor in.  And so I

12   believe it's reasonable to do the search that was done.

13            And as Agent Marshall testified, the agent could

14   have done the same search at the border, on the jetway, but

15   it would have taken much longer.  The search tools only made

16   the search more efficient.  And in fact, limited the

17   documents that Agent Hamako ultimately searched, which made

18   it even more routine, if we must use that word, more

19   reasonable.  He wasn't looking at everything on that

20   computer.  It was more focused, based on the keywords.

21            THE COURT:  Well, one its key focuses,

22   accelerometers, Honeywell, he's looking for the

23   five-year-old e-mails, going back.  He's looking for the

24   2008 e-mails.  Does that matter?  Does that affect the

25   analysis here?

1          MR. YETTE:  You know, it's -- the search occurred

2     within the statute of limitations for charging that crime.

3     And so if he was able to find that information that

4     supported a criminal charge, as he did, I think that's

5     appropriate.  But, he was -- he was still interested in

6     finding out whether Mr. Kim continued to engage in similar

7     criminal conduct.  And that was the reason he --

8          THE COURT:  We are dancing on a very thin knife

9     edge here between had a particularized objective belief that

10    he was, and was interested in finding out whether he was,

11    that if this search required reasonable suspicion--and we

12    haven't ruled whether it has or it hasn't--that distinction

13    is important to me.  And a lot of your language posits

14    possibilities.  They wanted to know, he was concerned that

15    maybe.  And that's -- sure, but is that enough?

16         MR. YETTE:  Your Honor, I think reasonable

17    suspicion is also based on common sense and experience.  And

18    common sense says that if a man was in possession of child

19    porn four years ago on his computer and he's now walking in

20    the airport four years later with a computer --

21         THE COURT:  Going to Mexico.

22         MR. YETTE:  Common sense says yes.

23         THE COURT:  Okay.

24         MR. YETTE:  Okay.  But, here again, Mr. Yang (sic)

25    is leaving the country, possibly with export materials or

1    transactions, evidence of ongoing criminal activity on his

2    laptop, out of our country.  That's why we have the border

3    search authority, to protect against people leaving with our

4    export information that can't go to Iran or other countries

5    that we have sanctions against.

6         And to prevent an agent who's investigating and

7    has reasonable suspicion before he even finds the o-rings

8    the day he does the search from doing -- protecting the

9    border in that fashion just seems unreasonable.

10        THE COURT:  Well, no, to me the line would be he

11   detained it, he copied it, he sends it back, and before you

12   apply programs to search for 22 keywords in all of those

13   files, you ask a court for permission.  Nobody is saying --

14   I mean, it's -- the evidence is preserved the second he took

15   the laptop and copied it.  So, we're all talking about what

16   happened after it got copied.

17        MR. YETTE:  Well -- and there is that evidence

18   that a warrant was applied and --

19        THE COURT:  After he had -- I mean, that's --

20        MR. YETTE:  Well, that's because Agent Hamako was

21   acting under the border search authority that he believed

22   existed at the time that did not require reasonable

23   suspicion; there was no need to apply to the court for a

24   search warrant prior to the border search.  Now --

25        THE COURT:  If *Cotterman* applies --

1          MR. YETTE:  And it did not exist at the time.

2          THE COURT:  Right.  But I think from the motion to

3   suppress standpoint you look -- we're not suing him civilly,

4   we're talking about what to do now.  I guess one question is

5   should *Cotterman* apply, since the search took place at LAX?

6   You said --

7          MR. YETTE:  We said yes.

8          THE COURT:  -- in footnote 9, "The search took

9   place entirely within the Ninth Circuit, therefore,

10  defendants reliance seems more well-founded."  I couldn't

11  quite tell if that was agreeing that *Cotterman* applies or

12  just you like it better than something else.

13         What my first question is, is this the sort of

14  search that *Cotterman* would govern?  And then what is your

15  position about whether Ninth Circuit law should control my

16  decision?

17         MR. YETTE:  We have suggested that Ninth Circuit

18  law should apply or control your decision.

19         THE COURT:  All right.  Well, then why doesn't it

20  here?

21         MR. YETTE:  Well --

22         THE COURT:  You quoted the concurrence to me

23  several times, which is actually the dissent on this issue.

24  So, what about the majority opinion is distinguishable here?

25         MR. YETTE:  Well, Your Honor, if we go back to we

1    have border search authority and this is a -- a container

2    that can be searched, *Cotterman* does not apply.  But I

3    guess --

4           THE COURT:  *Cotterman* is about laptops and a

5    border.  So, there's two questions.  I mean, it seems like

6    you're saying *Cotterman* was just wrongly decided, period;

7    there should be no higher level of scrutiny for computers

8    ever, at least under the circumstances of this case, and now

9    you're saying the circumstances of that case either.

10          But, if I'm supposed to apply it, and they've said

11   for certain searches of computers you need a reasonable

12   suspicion, I hear you saying I have it.  But if I disagree

13   with you about whether you have it, was this a search that

14   needed it?

15          MR. YETTE:  No.  And I have to just go back to

16   asking whether the search was reasonable.  And when you

17   consider whether it was reasonable, you have to consider

18   what the Supreme Court, I guess, said in the *Montoya*

19   *Hernandez* case, I think, and you look at was it so invasive

20   or offensive?  Did it destroy something?  The answer is no.

21   This is still the search of the container, not a person.

22          THE COURT:  Well, those -- the two cases, the one

23   with the gas tank and the one with the body cavity search

24   are so -- so unlike anything we're dealing with here as to

25   be, I think, unhelpful.  They may signal to me that the area

1    where the Supreme Court is cabining border authority is

2    very, very, very narrow.  So I take your point about that.

3    But, but what does *Riley* add to the analysis?  What is the

4    fact that the Supreme Court has now taken note of the fact

5    when people are carrying their entire lives around with them

6    and that that's -- has privacy implications?

7             MR. YETTE:  I think common sense recognizes that

8    we all carry a lot of things or our laptops and phones.

9    *Riley* is not applicable here.  It's in the context of a

10   *Riley* stop where they've said --

11            THE COURT:  Search incident to arrest.

12            MR. YETTE:  Thank you.  That you have to have more

13   to search somebody's cell phone.  But, we're at the border

14   here and that rule does not apply.  At the international

15   border your laptop can be seized and conducted -- a border

16   search can be conducted if it's reasonable.  And perhaps I'm

17   suggesting we get away from the routine, nonroutine language

18   and ask whether the search was reasonable.

19            And here, to look at Mr. Kim's computer, for all

20   of the reasons we've said, is reasonable.  It didn't take a

21   long time.  It was returned to him.  I think there was the

22   one civil case where the laptop was kept for 43 days or

23   something like that.  That didn't happen here.  It was

24   imaged in a few days.  Even though there's no real evidence

25   in the record about when the laptop was returned, there's no

1    allegation that it -- I don't believe, that it was kept so

2    long that it became an unreasonable, you know, taking of his

3    property.  And so just looking at it from that perspective,

4    I think you have to say this is reasonable.

5          And search tools, you could -- use of Intella or

6    EnCase does not make it an unreasonable, invasive search

7    because you're doing the same thing more efficiently that

8    you could do over a long period of time.  That's in favor of

9    a person -- you know, that works to a person's benefit, to

10   shorten a border search.

11          THE COURT:  Well, the District Court in Maryland

12   draws a distinction between a manual review at the border,

13   which could even take place away from the border, or the

14   application of software to analyze a hard drive, which is

15   where he starts to go with nonroutine.  And so, is that the

16   appropriate analysis?  Is that what I should be looking at?

17   How do I figure out what's reasonable or not reasonable and

18   what is a border search and what isn't a border search?

19          MR. YETTE:  I think we're hoping that you don't go

20   down that road, frankly, and that you decide that there was

21   reasonable suspicion.  And if not, that we had the -- if

22   that's not necessary -- well, once you start trying to

23   define these forensic examinations of a computer, there is

24   no standard definition.  And, you know, the Ninth Circuit is

25   saying one thing, the District Court in Maryland is saying

1    something.  You might end up saying yet another -- giving

2    another test.  You've already said this seems somewhere in

3    the middle, you know, the examination that took place.  I

4    don't know that I can say where the line becomes --

5              THE COURT:  Well, you've already said if I'm going

6    to follow something, I should follow *Cotterman*.

7              MR. YETTE:  That is right.

8              THE COURT:  So why is this not the search -- a

9    search -- is your answer to *Cotterman* only we have

10   reasonable suspicion?  Or is your answer to *Cotterman* we

11   don't even have to get there because this is not the kind of

12   search that was done in *Cotterman*?

13             MR. YETTE:  I would say that, the latter.

14             THE COURT:  Okay.  And why?

15             MR. YETTE:  Well, you -- the search --

16             THE COURT:  I think we need to have that position,

17   in the event I don't agree with you on reasonable suspicion.

18   I haven't ruled.  I don't think anybody should draw any

19   conclusions from my questions.  I think you can tell I find

20   this case to be difficult on every single one of these

21   things that I could just decide and make it easy.

22             MR. YETTE:  Perhaps then, Your Honor, I would say,

23   maybe just on that limited question, if I go back and look

24   at *Cotterman* -- you're asking whether there's a distinction

25   between this case and *Cotterman* regarding the search of the

 1    laptop.  I might want to ask for more time to address that

 2    question.

 3              THE COURT:  All right.  All right.  Well, I -- I

 4    will look at the case and look back at what the agent said.

 5    And, you know, if I feel like I need to hear more from you

 6    on that subject, I'll give you the opportunity.  I realize

 7    you're not waiving the point, that you're saying no, this

 8    isn't the kind of search to which reasonable suspicion would

 9    apply.  And no, we don't have reasonable suspicion -- and we

10    do have reasonable suspicion anyway.

11              But, I think the fact that I was concerned about

12    whether reasonable suspicion was needed is something that

13    I've made very clear is an issue for me, and certainly

14    became even more clear when I asked the agent to testify.

15              All right.  Well, is there anything -- any other

16    points you wanted to make?

17              MR. YETTE:  I don't think so, Your Honor.

18              THE COURT:  All right.  It is your motion, so if

19    you have anything -- I think you really made your points the

20    first time around.  But if there's something specific you

21    want to say in rebuttal, I'll give you that opportunity.

22              MR. DEITCH:  I'll be very brief because I assume

23    you'll appreciate that.

24              On the issue of the *Riley* case, that's really the

25    only point I wanted to address.  I do think that *Riley* is a

1    demonstration of how the Supreme Court sees the evolving

2    balance between privacy involving electronic media and

3    invasions of that privacy.  In *Riley* you had a search

4    incident to arrest.  And traditionally the belief was that

5    the balance of governmental interest versus individual

6    privacy tipped in favor of the government in permitting the

7    government to basically search -- do a pocket dump and all

8    of those kinds of things, including searching a phone that

9    an arrestee had.

10           And what *Riley* -- what the Supreme Court really

11   says in *Riley* is that the kinds of information and the

12   volume of information contained in electronic media devices

13   is such, in our present day, that the privacy interests may

14   tip differently.  And I suggest that Your Honor could

15   consider that in this case, in the context of the border,

16   which is not just a plenary black and white authority, but,

17   rather, a balance that tips in favor of the government

18   because of the government's interests at the border, that an

19   appreciation of the privacy of electronic media devices also

20   plays into the question of whether a search at the border is

21   reasonable.  And that's really how I view the *Riley* case as

22   impacting this case here.

23           THE COURT:  I mean, what I saw was that because of

24   the extraordinary amount of private information in a phone,

25   the court measured that against the underpinnings of the

1   constitutional principle that allowed broad searches

2   incident to arrest.  So it seems to me it invited a

3   comparison to the underpinnings that involve to give broad

4   authority to search at the border.

5            MR. DEITCH:  Because both involve balancing and a

6   question of what the reasonable balance is.

7            THE COURT:  I mean, at the border there's

8   practically no balancing.  I mean, it's pretty much anything

9   goes, with a really little narrow window at the top.  I

10  disagree with you about how wide open the window is.  But I

11  do think that is tied to the purposes of it.

12           MR. DEITCH:  The window only needs to be big

13  enough for this one case.

14           THE COURT:  To get through.  And it's skinny so far.

15           All right.  On that note, I very much appreciate

16  the arguments of counsel, the briefs so far.  I wish

17  somebody had pointed me to a case that told me what the

18  answer is, but I don't think there is one case that tells me

19  what the answer is.  And I'm going to take it under

20  advisement.  So thank you very much.

21           MR. DEITCH:  I'm sorry, Your Honor.  Before we

22  adjourn, do we need a date for the defendant's return, or is

23  he simply subject to -- I mean, he certainly will return

24  when the court instructs him to.

25           THE COURT:  I don't have a date.  My ruling is

1      going to govern what the next step is.  And in any event, it

2      will probably be a status hearing of some sort.  I can't set

3      it now.  I believe -- under the speedy trial act there's a

4      provision that if I take a matter under advisement at a

5      proceeding, I have additional time to rule.  I am giving

6      myself that time; I need it.  Whether we run up against it

7      at the end and whether I take some of his time or you waive

8      more time will be an issue that we'll come to if I'm not

9      done at the end.

10             I expect to try to meet the deadlines established

11     by the speedy trial act.  And then at that point I think

12     we'll know what we need to do next.

13             MR. DEITCH:  I was really less focused on the

14     speedy trial issues, as just on the logistics of the court's

15     management of the supervision.  I just want to make sure he

16     remains in compliance.

17             THE COURT:  He needs to continue to do what he

18     does -- all his bond conditions are in place.  And his bond

19     permits him to be at home, I believe, so he can -- nothing

20     is going to change there.

21             MR. DEITCH:  That's fine, Your Honor.  I know some

22     courts prefer to have a date, so that the defendant is kind

23     of on a hook, but if you're --

24             THE COURT:  Right, but that date would require him

25     to make travel arrangements to come here.

1              MR. DEITCH:  It's fine.  I agree.

2              THE COURT:  I think we should wait until it's

3     closer, then we can talk about whether we need another date.

4              MR. DEITCH:  Understood.

5              THE COURT:  All right.  Thank you.

6                              *  *  *

7

8

9              CERTIFICATE OF OFFICIAL COURT REPORTER

10

11

12              I, JANICE DICKMAN, do hereby certify that the above

13     and foregoing constitutes a true and accurate transcript of

14     my stenograph notes and is a full, true and complete

15     transcript of the proceedings to the best of my ability.

16                    Dated this 15th day of May, 2015.

17

18

19                    /s/_____

20                    Janice E. Dickman, CRR, RMR
                      Official Court Reporter
21                    Room 6523
                      333 Constitution Avenue NW
22                    Washington, D.C. 20001

23

24

25